The STATE of Ohio, Appellee,

v.

BAYER, Appellant.

[Cite as *State v. Bayer* (1995), 102 Ohio App.3d 172.]

Court of Appeals of Ohio,
Eleventh District, Geauga County.

No. 94–G–1853.

Decided March 27, 1995.

*A.M. Psenicka,* Chardon Law Director, for appellee.

*Scott A. Rosenthal,* for appellant.

---

FORD, Presiding Judge.

"It is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial, and independent as the lot of humanity will admit. Massachusetts Constitution of 1780, pt. 1, art. 29 in *Federal and State Constitutions* 3:1888, 1893 (Francis N. Thorpe ed. 1909)." Shapiro, Oxford Dictionary of American Legal Quotations (1993) 197.

This tenet continues to be true today as the judiciary must not only remain detached and neutral in any proceeding before it, but the court must also epitomize itself as the paragon of impartiality.

" 'It is of vital importance that the litigant should *believe* that he will have a fair trial.' *State, ex rel. Turner v. Marshall* (1931), 123 Ohio St. 586 [176 N.E. 454].

" ' * * * Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way, *"justice must satisfy the appearance of justice."* *Offutt v. United States,* 348 U.S. 11, 14 [75 S.Ct. 11, 13, 99 L.Ed. 11, 16].' *In re Murchison* (1955), 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942, 946]." (Emphasis added.) *Monroeville v. Ward* (1971), 27 Ohio St.2d 179, 195, 56 O.O.2d 110, 118, 271 N.E.2d 757, 766 (Corrigan, J., dissenting.)

It is with this predicate in mind that we address the matter before this court.

Appellant, William J. Bayer, was charged with aggravated menacing, a first degree misdemeanor. However, after appearing *pro se* at a bench trial, he was convicted of the lesser included offense of menacing, a fourth degree misdemeanor. He was fined $250 and sentenced to thirty days in jail. The court suspended the fine and the incarceration and placed appellant on probation for three years.[1]

Appellant had been embroiled in a land dispute with his next-door neighbors, the Neffs, concerning a structure which encroached upon his land and which was violative of a local zoning ordinance setback requirement. This feud finally erupted into a legal brouhaha.

The Neffs retained Attorney Edward Brice, a former municipal court prosecutor and the complainant in the underlying criminal action pending before this court, to represent them. They originally sought a variance on the setback restriction, but this was denied by the local zoning authority. Subsequently, after negotiations between the parties failed to resolve the fray, attorney Brice, on December 16, 1993, informed appellant's attorney that the Neffs would remove the portion of the structure which infringed upon appellant's property.

Appellant, more than one month later, on January 24, 1994, hand-delivered a letter to Brice advising him:

"In complete absence of any action or notification of impending action by either your client or the township towards the removal of the trespassing building for which your client was denied a zoning variance on 5–5–93, and on the advice of [my] attorney Gerald Patronite, demolition of your client's non-permitted trespassing structure has been scheduled to begin this coming weekend."

Brice contacted his clients and informed them of appellant's notice. He subsequently forwarded a response to appellant's attorney, with a copy to appellant, which contained the following passage:

"*PLEASE BE FURTHER ADVISED THAT UPON MR. NEFF BEING GIVEN THE CONTENTS OF MR. BAYER'S JANUARY 24, 1994 CORRESPONDENCE, INCLUDING THE SCHEDULED 'DEMOLITION' OF HIS PROPERTY BY MR. BAYER, MR. NEFF SUFFERED A STROKE AND WAS TAKEN TO THE HOSPITAL IN AN AMBULANCE, WHERE HE IS NOW CONVALESCING.*"[2] (Emphasis *sic.*)

---

1. While the judgment entry reflects that appellant was placed on probation for three years, the transcript reflects that in open court, he was accorded two years' probation. Appellant assigns this *ex parte* modification as error, and it will be addressed in greater detail in appellant's fifth assignment of error.

2. The Neffs subsequently filed a civil action against appellant for intentional infliction of emotional distress, but they later dismissed the suit.

Appellant hand-delivered his response to Brice's letter on January 27, 1994.[3] At the trial, Brice's receptionist testified that appellant entered Brice's law office; she greeted him and signed for the correspondence. He immediately turned to leave, but she informed appellant that Brice wished to speak with him. Appellant declined the invitation and responded, as she recalled, "You tell Ed Brice to suck my dick."[4] Appellant then started to leave, but before exiting "leaned up the stair case to yell up and he said, 'Ed Brice, I'll see you in court.'" From the time appellant entered the office until he departed, less than thirty seconds elapsed.

Brice, who was on the telephone, heard this commotion and placed his client on hold. He went down the steps and out the door, sans a hat or coat, pursuing appellant, who was in his pickup truck backing out of a parking space. This witness noted that appellant stopped his truck and yelled at Brice, "Fuck you, motherfucker." Additionally, she saw him say something else to Brice, but was unable to decipher the discourse, and did not hear appellant threaten her employer. At that point, she saw Brice gesture with his hands and return to the office.

The complainant, Brice, was called to testify. After hearing the disturbance in his office, he stated that he followed appellant:

" * * * I went down the stairs, out the front door * * * and started walking down the parking lot. [Appellant's] pickup truck was backing out of the parking spot, and as it stopped, the brake lights came on, his head came out the window * * * and he said words to this effect, 'Fuck you, you cocksucker.'

"I hesitated for a split second, because I still wanted to tell him, first of all, since he had an attorney, that enough was enough of these letters, that I was getting letters or faxes from his attorney, that I wanted to go through his attorney to resolve this matter. And I was also concerned about this letter I had gotten saying that the barn was going to be demolished.

"So when the first set of obscenities came out, I hesitated for a split second and started to still walk towards the vehicle. *I guess I was about 30 feet away.* [Appellant's] head came out again, and this time the door opened, and at that point he looked back at me and said, 'You come any closer, I'm going to punch your lights out.'

---

3. In the letter, he indicated: "Unless instructed otherwise by some proper authority, the notice that you received from me date [*sic*] 1–24–94 is still in effect." In a postscript he added: "In spite of our dispute and his underhanded attempts to bring multiple damages upon my family and me, please extend to Mr. Neff my heartfelt wishes for his speedy recovery."

4. Appellant, during his cross-examination of the secretary, intimated that he instructed her to tell Brice to "go blow" rather than the vernacular she had remembered.

"I said, 'I don't need this,' put my hands up, turned around, came back to the office." (Emphasis added.)

The prosecutor, after eliciting affirmative responses from Brice as to whether he was "placed in fear by that statement" and whether he was "upset," had no further questions of this witness.

Appellant then sought to impeach Brice. Specifically, appellant attempted to demonstrate the witness's vested interest in the matter.[5] After affording appellant some leeway in his cross-examination of the complainant, the court halted the inquiry.

Appellee presented testimony from one additional witness, an associate of Brice, who testified that Brice, upon returning to the office, was flushed and seemed preoccupied. The state rested.

Appellant was then sworn. He began to testify about the totality of events regarding the dispute, but before appellant had indicated that he had concluded his testimony and his evidential presentation, the court and the prosecutor engaged in the following colloquy:

"MR. PSENICKA: Your Honor, I would accept fourth-degree menacing.

"THE COURT: That's what I think it is, too.

"MR. PSENICKA: I think it's fourth-degree menacing.

"THE COURT: I do, too. It's not aggravated menacing, but it's fourth-degree menacing.

"MR. PSENICKA: And I would want a no contact order, no trespassing, and I would request that Mr. Bayer seek some sort of counseling in regards to this property. It is an emotional issue with him."[6]

Appellant then joined in:

"MR. BAYER: It wouldn't be menacing, if you did, because it was provoked.

"THE COURT: Provoked doesn't have anything to do with it. He's a lawyer, what the hell did he provoke?

---

5. Although appellant did not make a formal proffer for the record, this court is able to glean that appellant wished to demonstrate that Brice had an established stake in appellant's conviction, arguing that Brice's client's civil suit would benefit from a guilty verdict. Indeed, the civil suit filed by Brice, on behalf of the Neffs, included allegations stemming from the incident at issue and a disorderly conduct conviction arising from appellant's no contest plea from a prior altercation with the Neffs. Further, appellant sought to suggest that Brice had fabricated testimony at the zoning hearing.

6. From this it appears that the court and the prosecutor engaged in a plea bargaining exercise. At this juncture of the lower court proceeding, this action is beyond the province of the trial court and should not be condoned.

"MR. BAYER: He came out—

"THE COURT: Ed did not provoke. He must try to resolve the damn thing the best way he can for his client, and you're upset because your attorney isn't doing the best for you.

"MR. BAYER: His chasing me out the parking lot to tell me the —."

This exchange in effect concluded appellant's defense. While there was additional discussion on the record regarding the status of the land dispute, no other evidence was offered with respect to the instant matter. The court then sentenced appellant to thirty days in jail and fined him $250 and suspended both. The prosecutor then requested that appellant be placed on two years' probation, to which the court responded, "That's fine."

Appellant appealed, raising the following assignments:

"1. The trial court erred in failing to inform appellant of his rights at arraignment, violating Crim.R. 5, 10, 11 and 22; failing to determine whether counsel should be appointed violating Crim.R. 44; and in setting a pretrial for an unrepresented defendant, violating Crim.R. 17.1.

"2. Appellant was denied due process of law and the right to a fair trial where the trial judge exhibited bias and failed to follow proper criminal procedure at the threshold.

"3. The trial court erred in convicting appellant for menacing where his statement was privileged under the circumstances."

Appellant, after obtaining leave of court, presented two supplemental assignments:

"4. The trial court erred in failing to grant appellant's repeated requests for a bill of particulars where the complaint was general and listed an incorrect date of incident.

"5. The trial court erred in modifying appellant's sentence outside his presence in court, in violation of Crim.R. 43(A)."

■ In the first assignment, appellant alleges that the court failed to advise him of his rights at the initial appearance,[7] proceeded without affording appellant the opportunity to obtain counsel, and scheduled a pretrial without counsel.

---

7. This exercise is incorrectly referred to by the appellant and in the trial court's materials as "arraignment." While Traf.R. 8(A) refers to a similar activity as an "arraignment," no such terminology is contained in the Criminal Rules with respect to misdemeanor matters in the municipal courts. Rather, it is the proceeding that is had after an indictment is rendered in the court of common pleas. Therefore, both the court's and appellant's characterization of this endeavor as "arraignment" is erroneous.

Crim.R. 5 requires the court to inform the defendant of the nature of the charge of his right to counsel or appointed counsel and right to a continuance to obtain counsel, and of his right to a jury trial. In addition, Crim.R. 10 mandates that the court determine that the accused understands these rights. See, also, *State v. Biggs* (May 5, 1992), Greene App. No. 91 CA 11, unreported, 1992 WL 95363, and *State v. Orr* (1985), 26 Ohio App.3d 24, 26 OBR 192, 498 N.E.2d 181.

■ To further safeguard the accused's right to counsel, Crim.R. 22 requires that "[i]n petty offense cases all waivers of counsel required by Rule 44(B) shall be recorded * * *." In this matter, there is no such recordation of a waiver. This constitutes error.

"The requirements of the Criminal Rules are mandatory; all waivers of counsel must be made in open court and must be recorded. * * * Because courts indulge every reasonable presumption against a waiver of fundamental constitutional rights, * * * that waiver must affirmatively appear on the record. * * * A knowing and intelligent waiver will not be presumed from a silent record." (Citations omitted.) *Garfield Hts. v. Brewer* (1984), 17 Ohio App.3d 216, 217, 17 OBR 458, 459, 479 N.E.2d 309, 311.

In *State v. Doane* (1990), 69 Ohio App.3d 638, 646–647, 591 N.E.2d 735, 741, this court articulated that a knowing and intelligent waiver of counsel can only be valid when the defendant is:

" '[M]ade aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open * * * [and that he is informed of] the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.' " (Citations omitted.)

■ At the initial appearance on February 22, 1994, appellant was allegedly provided with a copy of a pamphlet prepared by the Chardon Municipal Court which appellee claims fulfilled these dictates.[8] Then, prior to addressing appellant directly, the court read a standardized introduction to all who were in the courtroom:

"This proceeding is known as the arraignment. It is your opportunity to enter a plea to the charge for which you are here. The possible pleas you can enter are

---

8. This "fact" is in the record before this court by way of an August 12, 1994 affidavit submitted by William Cukr, the Chardon Municipal Court Bailiff, who states "that William J. Bayer, at his arraignment on the 22nd day of February, 1994 was handed the pamphlet * * *."

'Guilty', 'Not Guilty', or 'No Contest'. * * * If you enter a plea of 'Not Guilty', I will ask you to see Mrs. Hanson, who is seated at the table to my left, and you will need to sign a Waiver of Speedy Trial and a Personal Recognizance Bond. If there is an accident involved, you can enter a plea of no contest and I make a finding of 'Guilty.' That finding of 'Guilty' cannot be used against you in a civil suit.

"Each of you received a blue pamphlet when you checked in this morning. Please read this pamphlet when you get the opportunity this morning. The back page will tell you about the costs involved in addition to the fine. * * * " [9]

■ The record reveals that when appellant was called at the initial appearance he appeared before the court and was immediately required to enter a plea.[10] He pleaded not guilty. The court next asked appellant if he had an attorney, to which appellant indicated that he did not. The matter was then scheduled for a pretrial. Some other dialogue was had, but it was not of the nature commanded under Crim.R. 5 or Crim.R. 10 and did not demonstrate that appellant was afforded the opportunity to read the material in the booklet, or that he was literate, let alone able to discern its contents, including the nature of the charge, his right to counsel and right to a jury trial. Therefore, this one-sided "rights" colloquy addressed to all of the defendants, en masse, fails to provide the requisite discourse between the court and the accused to ensure comprehension of these rights.

■ Appellee's alternate argument suggests that since appellant was placed on probation, the court's failure to advise appellant of these rights was harmless. Appellee notes that pursuant to *State v. Haag* (1976), 49 Ohio App.2d 268, 3 O.O.3d 301, 360 N.E.2d 756, a verdict is not to be reversed based upon such an omission, but only the imprisonment portion of the sentence vacated. However, while this is correct when applied to violations solely of the right to counsel, it is not true with respect to breaches of appellant's other rights including jury trial. Further, given the multitude and magnitude of the other infringements, *Haag* is inapplicable. The first assignment has merit.

■ In the second assignment, appellant alleges that the trial court exhibited bias, and, thereby, denied appellant a fair trial. We agree.

The Code of Judicial Conduct provides, in relevant part, the following:

---

**9.** The transcript from the initial appearance does not contain this dialogue. However, it is in the record before this court as an attachment to Cukr's affidavit which avers that appellant was present in the courtroom when the statement was read by the judge.

**10.** Additionally, it should be noted that the court also proceeded without any inquiry on this issue at the trial. Absent a prior, valid, waiver of counsel, this also constitutes error.

"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code shall be construed and applied to further that objective." Canon 1.

"A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. A judge should not allow his family, social or other relationships to influence his judicial conduct or judgment. * * *" Canon 2(A) and 2(B).

"* * * A judge must avoid all impropriety and appearance of impropriety. * * *" Commentary to Canon 2(B).

"A Judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where: (a) he has a personal bias or prejudice concerning a party * * *." Canon 3(C)(1).

The Supreme Court of Ohio has noted:

"The term 'biased or prejudiced,' when used in reference to a judge before whom a cause is pending implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *State, ex rel. Pratt v. Weygandt* (1956), 164 Ohio St. 463, 58 O.O. 315, 132 N.E.2d 191, at paragraph four of the syllabus.

■ From a review of the record, we are not able to conclude that the trial court was neither biased nor prejudiced, and its recorded statements "fail[ed] to evince an aura of pure impartiality." *State v. Kay* (1967), 12 Ohio App.2d 38, 46, 41 O.O.2d 91, 96, 230 N.E.2d 652, 658. The court noted "undue friendship or favoritism" based upon a twenty-year relationship with Brice. Specifically, as appellant was seeking to question the witness's credibility, the court interjected:

"THE COURT: * * * *Ed [Brice's] credibility really is not an issue,* Mr. Bayer.

"MR. BAYER: I understand he's a community member up here, but ever since this started—

"THE COURT: *His credibility is not an issue with this Court anyway. I've known Ed for 20 years,* and I've never known his credibility to be anything—

"MR. BAYER: Character reference.

"THE COURT: Hey. I'm sorry, there are some attorneys I wouldn't trust. I trust him, I'm sorry."[11]   (Emphasis added.)

From this exchange and the court's express statement, we are only able to conclude that the trial court declined to impartially hear evidence as concerns the complainant's credibility.

Furthermore, the court, though not in a strict legal sense, essentially required appellant to testify in violation of his constitutional right against self-incrimination. As appellant proceeded with his cross-examination of Brice, the court interrupted the inquiry:

"THE COURT: Let's assume that's true. You know the only issue I want to know: *Did you say to him, 'I'm going to punch your lights out'?  That's it.*

"He said it. *You say what?*

"MR. BAYER: I believe I said something like that. I didn't—

" * * *

"THE COURT: That's the only issue isn't it? Isn't that the only issue. You menaced him. *You're admitting that you said it.*"[12]   (Emphasis added.)

Finally, the judge, in open court, demonstrated his predisposition in the matter:

"MR. BAYER: Can I ask you one final thing? One thing that I was afraid— see, I figured I probably would be convicted, coming in here without an attorney.

"THE COURT: *You were going to be convicted no matter what * * *.*" (Emphasis added.)

This type of conduct has no place in the administration of justice, and this court will not indulge a reincarnation of Judge Roy Bean and his "Law West of the Pecos" style of adjudication East of the Cuyahoga. This assignment is sustained.

■   In the third assignment, appellant alleges that his statement was "privileged." In presenting this argument, counsel has convoluted self-defense theo-

---

11. This court is unaware of any authority or any instance which supports the trial court's statement regarding the credibility of a witness. Credibility is always in issue, whether impeached or not, and it is for the factfinder to impartially determine if the witness is credible and the amount of weight to be afforded to that particular witness's testimony.

12. From the tenor of the question, it appears to this court that appellant was compelled to reply to this inquiry in violation of his right against self-incrimination. Appellant had not been sworn in at this time, and his "admission" was not a statement under oath, but this court is able to infer that the trial court treated it as such. Additionally, the trial court erroneously stated the elements of the charged offense as merely uttering threatening words is insufficient. The statute requires that the victim must feel threatened or intimidated or "believe that the offender will cause [him] physical harm * * *." See *infra.*

ries to support this concept of "privilege" vis-a-vis the notion of "conditional threat."

The menacing statute, R.C. 2903.22(A) provides: "No person shall knowingly cause another to believe that the offender will cause physical harm to the person * * *." The Committee Comment to R.C. 2903.21 provides further clarification:

"Neither aggravated menacing nor menacing requires that the offender be able to carry out his threat or even believe himself capable of carrying it out. It is sufficient if the offender knowingly causes the victim to believe the offender will carry his threat into execution. The rationale for this is that regardless of whether the offender is bluffing or in earnest the victim may be impelled to violence to counter what he believes to be a real threat. If the victim of a threat is not in fact intimidated, the offender's conduct would constitute attempted menacing if his purpose was to intimidate or he knew that his conduct would probably intimidate."

Clearly, the statute does not create an exception predicated upon a "conditional threat." Furthermore, this novel theory has been expressly rejected by four appellate courts, including this one. See *State v. Jones* (Jan. 29, 1982), Clermont App. No. CA–1044, unreported, 1982 WL 6031 ("If you fuck with my car, I'll break your damn neck, you bitch."); *State v. Sharp* (June 30, 1982), Medina App. No. 1128, unreported, 1982 WL 5077 ("Keep your hand off my wife's knee or I'll kick your ass."); *Columbus v. James* (Sept. 15, 1988), Franklin App Nos. 87AP–1218 and 87AP–1222, unreported, 1988 WL 96240 ("You come in, I'll kick your ass."); and *Columbus v. Hutchins* (July 30, 1991), Franklin App. No. 91AP–18, unreported, 1991 WL 151222 (I will "bust" you if you do not let go of my wife.).

In this jurisdiction, in *State v. Boggs* (Dec. 14, 1990), Portage App. No. 89–P–2083, unreported, 1990 WL 208822 ("Get the hell out of here or I am going to shoot you"), this court cited *Sharp* and *Jones*. We declined to adopt appellant's position that the victim "had control over the conditions which would have triggered the threats being carried out" and that the statement therefore constituted a conditional threat, and we affirmed Boggs's conviction of menacing.

As noted, at the time that the offending statement was made, Brice, as he testified, was thirty feet away from appellant. Further, Brice affirmed that he was put in fear. If believed, this fact pattern was sufficient to establish the offense of menacing. Unfortunately, this evidence was immersed in a cauldron of star chamber chemistry that adulterated the relative credence normally accorded to the participants, including challenges regarding the credibility of the witness's averment that he was placed in fear by appellant's statement which was made while sitting in a running vehicle some thirty feet from the victim. However, in the strict sense, this assignment is without merit.

■ In the fourth assignment, appellant maintains that the prosecution failed to provide appellant with a bill of particulars. Crim.R. 7(E) requires that the request be made within twenty-one days of arraignment or upon order of court. In the instant action, while appellant did not make a timely request, the court granted his motion requesting a bill of particulars.

The prosecution avers that it responded to the motion by providing appellant with a copy of its entire file, which contained the police report detailing the incident. Nothing in the record supports this assertion. The only material in this court's file is the narrative report prepared by the local law enforcement office regarding the alleged incident attached to appellee's motion to supplement the record and an unsworn statement in appellee's brief that this was provided to appellant. Therefore, we are unable to conclude appellee complied with the trial court's order, but this failure does not rise to the crest of prejudicial error requiring a reversal on this issue.

In *State v. Brown* (1993), 90 Ohio App.3d 674, 630 N.E.2d 397, this court did not find error when the prosecution failed to provide the appellant with a bill of particulars, as the indictment provided appellant with all of the pertinent information, properly advising appellant "as to the time, place, nature, and substance of the harm allegedly inflicted upon the claimed victims." *Id.* at 682, 630 N.E.2d at 402. Furthermore, it is evident that appellant was aware of the "nature of the offense charged and of the conduct * * * alleged to constitute the offense." Crim.R. 7(E). Appellant was prepared to defend himself against the aggravated menacing charge which stemmed from his statement made to Brice in the parking lot. The prosecution's failure to provide him with a "formal response" elevates form over substance, and it was not prejudicial to appellant's trial preparation. *Brown* at 682, 630 N.E.2d at 401–402. This assignment is without merit.

■ In the fifth assignment of error, appellant alleges that the court erred by imposing a three-year term of probation, after in open court indicating that appellant was to be placed on probation for two years. This error is supported in the record, and this assignment has merit.

■ While it is not within this court's province to require the trial judge to recuse himself from the retrial of this matter on remand pursuant to the dictates of *Beer v. Griffith* (1978), 54 Ohio St.2d 440, 8 O.O.3d 438, 377 N.E.2d 775, and *Univ. Hts. v. Milton* (1988), 55 Ohio App.3d 145, 563 N.E.2d 42, we would strongly encourage him to do so and to request that the Chief Justice of the Supreme Court of Ohio appoint another judge to hear this matter should the prosecution elect to proceed anew. See, *e.g., Bedford v. Lacey* (1985), 30 Ohio App.3d 1, 30 OBR 38, 506 N.E.2d 224. This is suggested so that:

" 'The purity and integrity of the judicial process [may be protected] against any taint of suspicion to the end that the public and litigants may have the highest confidence in the integrity and fairness of the courts' * * * [and to render a righteous judgment] ' "in such a manner as will beget no suspicion of fairness or integrity of the judge." ' " *Weygandt*, 164 Ohio St. at 471, 58 O.O. at 319, 132 N.E.2d at 196–197, citing *Haslam v. Morrison* (1948), 113 Utah, 14, 20, 190 P.2d 520, 523.

This is of utmost import, as Daniel Webster noted:

"There is no happiness, there is no liberty, there is no enjoyment of life, unless a man can say when he rises in the morning, I shall be subject to the decision of no unjust judge to-day. * * * *Papers of Daniel Webster: Speeches and Formal Writings* 1:459–60 (Charles M. Wiltse ed. 1986)." Shapiro, Oxford Dictionary of American Legal Quotations (1993) 198.

For the foregoing reasons, the decision of the trial court is reversed and the cause is remanded for proceedings consistent with this opinion.

*Judgment accordingly.*

CHRISTLEY and NADER, JJ., concur.