**CITY OF BROADVIEW HEIGHTS, Appellee,**

v.

**BARON, Appellant.**

[Cite as *Broadview Hts. v. Baron* (2000), 139 Ohio App.3d 729.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 76490.

Decided Sept. 14, 2000.

*Timothy Miller*, Special Prosecutor, for appellee.

*Joseph A. Lewandowski*, for appellant.

TIMOTHY E. MCMONAGLE, Judge.

Defendant-appellant, Ronald M. Baron, appeals his convictions in the Parma Municipal Court of menacing, disorderly conduct, and telephone harassment. For the reasons that follow, we affirm.

I

In 1998, the city of Broadview Heights charged appellant with sixteen counts of alleged criminal behavior in seven criminal cases. In case No. 98–CRB–2122,

appellant was charged with one count of menacing, in violation of Broadview Heights Codified Ordinance 636.05, and three counts of disorderly conduct, in violation of Broadview Heights Codified Ordinance 648.04. In case No. 98–CRB–2464, appellant was charged with one count of unlawful restraint, in violation of Broadview Heights Codified Ordinance 636.06, and two counts of disorderly conduct. In case No. 98–CRB–00543, appellant was charged with one count of disorderly conduct. The charges in these cases arose out of incidents involving appellant and his neighbors on April 12, 1998, June 21, 1998, and November 7, 1998.

In cases Nos. 98–CRB–03198, 98–CRB–03199, 98–CRB–03200, and 98–CRB–03201, appellant was charged with two counts each of telephone harassment, in violation of R.C. 2917.21. The charges in these cases stemmed from harassing telephone calls that appellant made to the Broadview Heights Police Department on August 20, 23, and 29, 1998. The cases were consolidated for trial.

Prior to commencing trial on April 6, 1999, the trial judge granted the city's motion *in limine*, precluding appellant from presenting evidence regarding a lawsuit that appellant had filed in the United States District Court, alleging that Broadview Heights, various members of the Broadview Heights Police Department and the city prosecutor had violated appellant's civil rights by bringing and maintaining various criminal actions, including those at issue in these cases, against him. In addition, the trial court precluded appellant from introducing evidence of his military background and resultant post-traumatic stress syndrome.

During defense counsel's opening statement, however, the trial court determined that, despite numerous warnings and cautions by the court, defense counsel had purposely discussed these prohibited and other inflammatory matters with the jury during *voir dire* and his opening statement. Consequently, the trial court declared a mistrial. Finding that defense counsel's "defiant conduct in trial [had] interfered with the administration of justice," the trial court held defense counsel in direct contempt of court and fined him $500, to be applied toward jury costs necessitated by defense counsel's conduct.

Appellant then filed an affidavit of prejudice seeking to disqualify the trial judge. The Cuyahoga County Court of Common Pleas denied appellant's motion, finding "that the record fails to demonstrate bias and prejudice against defendant by Judge Timothy P. Gilligan and Parma Municipal Court."

Trial commenced again on May 5, 1998. Prior to beginning trial, the trial judge again granted the city's motion *in limine* to exclude any reference to appellant's post-traumatic stress syndrome or any other case involving appellant. The trial judge instructed counsel that "the only thing this jury is going to hear, and consider, is what happened on all the dates that are contained in these files."

The city called eleven witnesses. Bonnie Peretto testified that she and her husband, Fred, have lived next door to appellant for approximately three years. Mrs. Peretto described several confrontations with appellant that occurred in April 1998. According to Mrs. Peretto, on April 8, 1998, as she was pulling her car into her driveway, appellant's wife, Mary Lynne Baron, yelled at her, "You have to take that fucking shed down." Mrs. Peretto called the police but no charges were filed as a result of this incident. Mrs. Peretto testified that on April 9, 1998, as she was on her porch cleaning windows, appellant began yelling and screaming obscenities at her. Mrs. Peretto again called the police, who informed her that they could not take any action without proof of appellant's actions. On the following day, as Mrs. Peretto was getting into her car, appellant called her a "fucking bitch." The police again informed Mrs. Peretto that they could not press charges without proof of appellant's actions, so Mrs. Peretto purchased a sound-activated tape recorder.

Mrs. Peretto then described appellant's attack on Daniel Puttera, a neighbor who lives on the other side of appellant's house, on June 21, 1998. According to Mrs. Peretto, as she was in her backyard that day, she observed Puttera walk into appellant's backyard and heard him say, "Ron, can we talk?" She then observed appellant grab Puttera from behind "like in a hug." Mrs. Peretto testified that Puttera did not resist as appellant then walked Puttera into his garage.

Mrs. Peretto also testified regarding an incident involving appellant that occurred on November 7, 1998. At approximately 10:00 p.m., Mrs. Peretto was awakened by the barking of appellant's dog. Mrs. Peretto and her husband observed appellant and his wife, carrying flashlights, running in their backyard. Mrs. Peretto then heard appellant yelling, "Bonnie, don't you want to come see your boyfriend. He's on my property." The Perettos recorded appellant's other shouted comments, which included calling Daniel Puttera offensive names and references to Mrs. Peretto masturbating, on their tape recorder and provided the tape to the Broadview Heights Police Department.

Frederick Peretto testified that on April 12, 1998, while he was outside in his yard with his dogs, appellant began berating and threatening him, yelling that he was going to beat him up and tear down the shed in his yard. Appellant also told his dog, a large German Shepherd, to "kill" Peretto's dogs. Peretto tape-recorded this incident and provided the tape to the Broadview Heights Police Department.

Broadview Heights police officer Donald Polick testified that on April 11, 1998, he responded to a complaint from Bonnie Peretto regarding appellant, but no charges were filed as a result of the incident.

Daniel Puttera testified that he has lived next door to appellant for over five years. According to Puttera, he returned home at approximately 8:00 p.m. on June 21, 1998, and observed that two trees in his backyard had been cut down. When the police came, Puttera told them that he believed that appellant had cut down his trees. The police informed Puttera that they could do nothing without proof of appellant's actions. Hoping that appellant might admit that he cut down the trees, Puttera told the police that he was going to walk over to appellant's house and talk to him.

Puttera testified that he walked into appellant's backyard and said, "Ron, are you home?" When he saw appellant coming out of his house, Puttera said, "Ron, what's going on with these trees?" Appellant came up to Puttera and grabbed his arm, saying, "What are you doing on my property?" Appellant then shouted for his wife to "call the police" because Puttera was trespassing. According to Puttera, appellant then grabbed him in a bear hug and "manhandled" him into his garage, where Puttera tripped and fell to his knees.

Puttera also testified regarding the November 7, 1998 incident involving appellant. According to Puttera, at approximately 11:10 p.m., he walked to the woodpile in his backyard to get firewood. As he was walking back to his house, he saw appellant and his wife in their backyard. Appellant accused Puttera of trespassing on his property. Puttera ignored appellant and walked back into his house. Shortly after, the police arrived at Puttera's home and informed him that they had received a complaint from appellant that Puttera had trespassed on his property.

On cross-examination, Puttera denied that appellant had ever told him not to come on his property. Puttera also denied that he tried to hit appellant on June 21, 1998, when appellant had him in the bear hug or that he was trespassing on appellant's property on November 7, 1998.

Broadview Heights police officer Troy Schonberger testified that on June 21, 1998, he and Sergeant Kopniske responded to Puttera's complaint regarding his trees. Schonberger testified that Puttera told the officers that he was going to go to appellant's house to talk to him about the trees. Schonberger stood at the northeast corner of Puttera's house, from where he could see both Puttera's and appellant's backyards. He saw Puttera walk onto appellant's property, heard him call appellant's name, and then saw appellant come out of his house and yell, "Dan, I have you now. You're on my property." Schonberger heard Puttera tell appellant to "calm down," and then saw appellant grab Puttera by the arm and lead him toward his garage. Schonberger testified that Puttera did not struggle or make any threatening gestures toward appellant.

Police Officer Robert Novotny testified that he and another officer were dispatched to the Peretto residence on November 7, 1998, to respond to Mrs.

Peretto's complaint that appellant was yelling and creating a disturbance in his backyard. While they were taking Mrs. Peretto's statement, they were advised that another officer had been dispatched to appellant's home regarding an alleged trespasser in the backyard. The officers left the Peretto residence and went outside. Novotny testified that he observed appellant and his wife in their backyard. He saw appellant run over to Puttera's property line and heard appellant yell, "Dan, I got you now," and then start screaming obscenities.

Vickie Hutchison testified that she is a dispatcher for the Broadview Heights Police Department. Hutchison testified that on August 20, 1998, she received two anonymous telephone calls while she was working. At 7:51 a.m., a male caller asked her how many of the forty-nine officers recently arrested in an FBI sting in the city of Cleveland were from Broadview Heights. At 8:31 a.m., a male caller asked her "how many barks are in a dog?" Hutchison testified that she punched the star 57 keys on her telephone after both calls, activating a trace on the calls. Hutchison then turned her dispatch log over to the Detective Bureau of the Broadview Heights Police Department.

Crystal Kapitan testified that she was employed as a dispatcher for the Broadview Heights Police Department during August 1998. Kapitan testified that at 1:02 a.m. on August 23, 1998, a male caller asked her "if your s--- don't stink." On August 29, 1998, at 10:44 p.m., an anonymous male caller, referring to an incident involving a Broadview Heights councilman's wife, complained that a $5,000 bond for a person who had killed someone was not enough and stated, "your community is corrupt." Kapitan activated the star 57 tracing mechanism on both calls.

The prosecutor played a cassette tape recording of the harassing telephone calls for the jury. Both Hutchison and Kapitan admitted that the cassette tape played in court was not the original TEAC tape on which the harassing telephone calls were recorded but they identified the recording as a true and accurate recording of the calls they received on August 20, 23, and 29, 1998. Kapitan also testified that there was "no doubt in [her] mind" that the calls were made by appellant. She stated, "I know Mr. Baron's voice. I'm one of the only dispatchers that has ever actually talked to him when he's called us himself."

David Grossnickle testified that he is the Administrative Supervisor for the Broadview Heights Police Department. Grossnickle testified that all incoming calls to the police department are recorded on TEAC machines in the department. Because the TEAC machines are connected by heavy cables to a junction box in the police department, and not easily disconnected and transported to court, the policy of the Broadview Heights Police Department is to make copies of the TEAC tapes on a cassette tape when tapes are needed for court cases. Grossnickle testified that, pursuant to departmental policy, he made a cassette

tape recording of the prank telephone calls made to the Broadview Heights Police Department on August 20, 23, and 29, 1998, and identified Plaintiff's Exhibit 4, which was played for the jury, as the cassette tape he had made. Grossnickle testified further that several months prior to trial, he and Timothy Miller, the special prosecutor, had met with appellant and defense counsel and played the original TEAC tapes, from which the cassette tape had been made, for them.

On cross-examination, defense counsel attempted to challenge the authenticity of the cassette tape. The trial court excused the jury and then questioned counsel regarding his basis for challenging the authenticity of the tape. When defense counsel informed the trial court that he was challenging the authenticity of the cassette tape because the original tape had not been produced in court, the trial court instructed defense counsel that because he had listened to the original TEAC tapes from which the cassette tape had been made, he did not have a good faith basis for challenging the authenticity of the tape and, therefore, was not to continue questioning Grossnickle on that point. Defense counsel objected, insisting that he never listened to the original TEAC tape recordings of the telephone calls at issue. The trial judge then questioned Grossnickle regarding his earlier testimony that defense counsel had listened to the original TEAC tapes:

"COURT: Did he listen to the original TEAC tape off the machine? Mr. Lewandowski.

"GROSSNICKLE: Mr. Lewandowski listened to TEAC tapes. How many we played for him that day, I can't tell you how many I played for him.

"COURT: Can TEAC tapes be played on anything but the TEAC machine?

"GROSSNICKLE: Absolutely not.

"COURT: So, Mr. Lewandowski heard the originals?

"GROSSNICKLE: I would have to look at the dates and see the number of the date that he was there. Because after 90 days, I recycle the tapes."

The trial court then reiterated its finding that defense counsel did not have a good faith basis for challenging the authenticity of the cassette tape recording of the telephone calls. Defense counsel then proffered for the record the remainder of the questions he intended to ask Grossnickle, all of which related to the original TEAC tapes, and the trial judge excused Grossnickle from further testimony.

David Woehrman, manager of corporate security at Ameritech, testified that when the star 57 function is activated on a telephone, the Ameritech switching center records the number from which the telephone call originated. Woehrman testified that records from Ameritech's Annoyance Call Bureau indicated that the harassing telephone calls made to the Broadview Heights Police Department on

August 20, 23, and 29, 1998, originated from 440/230–9290, which Ameritech records indicate is the telephone number for appellant's residence.

Sergeant Steven Kopniske testified that he is assigned to the Detective Bureau of the Broadview Heights Police Department. Kopniske testified that on June 21, 1998, he responded with Officer Schonberger to Puttera's complaint regarding the trees that had been cut down on his property. While the officers were investigating the complaint, they were advised that appellant had reported a trespasser on his property. While Officer Schonberger waited on Puttera's property to see what happened when Puttera confronted appellant regarding the trees, Kopniske responded to appellant's complaint. When Kopniske pulled into appellant's driveway, he observed Puttera held in a bear hug by appellant and then saw Puttera drop to his knees.

Kopniske also testified that when he was advised of the prank telephone calls made to the police department in August 1998, he contacted the Annoyance Call Bureau at Ameritech to obtain a report concerning the calls. He also instructed Grossnickle, pursuant to usual practice and procedure, to make a cassette tape recording of the calls.

After defense counsel had asked Kopniske several questions on cross-examination, the trial judge discontinued further cross-examination because "all of these questions * * * is [sic] the same question asked time, and time, and time again. * * * It's just the same thing." When trial resumed the next day, the trial judge advised defense counsel that he could continue his cross-examination of Kopniske but warned counsel that he would again discontinue cross-examination if counsel repeatedly asked Kopniske the same question. After defense counsel repeatedly questioned Kopniske regarding the original TEAC tapes on which the prank telephone calls were recorded, the trial judge instructed defense counsel to ask a relevant question. When counsel again questioned Kopniske regarding the whereabouts of the original TEAC tapes, the trial judge discontinued further cross-examination.

Judith Labutta testified for the defense that she lives next to the Perettos. According to Labutta, she was outside tanning one day in 1998 when she heard Fred Peretto berate appellant, call him a "lowlife," and threaten to kill his dog. Labutta testified that Bonnie Peretto made similar remarks to appellant, but Labutta could not identify when the comments were made.

Ronda Baron, appellant's thirteen-year-old daughter, testified that on June 21, 1998, she observed that her father had Puttera in a bear hug "and he couldn't get away."

Appellant's wife, Mary Lynne Baron, testified that on April 9, 1998, when she questioned Bonnie Peretto regarding the Perettos' shed, Peretto called her "a lazy fat-ass bitch."

Baron testified further that on June 21, 1998, as she was in her house washing dishes, she saw someone in the backyard. Frightened, she called to appellant, who found Puttera trespassing in the backyard. Baron testified that Puttera had been on their property twenty to thirty times without their consent prior to this incident even though she and appellant had instructed him not to come on their property. According to Baron, Puttera repeatedly tore down the "No Trespassing" signs she and appellant posted on their property.

Appellant similarly testified that Puttera often came onto his property, even though he had been warned to stay off. Appellant testified that when Puttera trespassed on his property on June 21, 1998, he went up to Puttera and said, "Dan, I told you never to come on my property." According to appellant, Puttera then swung at him, so he grabbed him. Appellant denied that he tried to hurt Puttera. Appellant testified that he found Puttera trespassing in his backyard again on November 7, 1998, and ordered him to stay off his property. Finally, appellant denied making any harassing telephone calls to the Broadview Heights Police Department.

The jury found appellant guilty of all charges, except the charges brought in case No. 98–CRB–2464, relating to the incident on June 21, 1998. The trial court sentenced appellant as follows: (1) case No. 98–CRB–2122, on count one, one-hundred-eighty days' incarceration and a $250 fine, suspended; on counts two through four, one-hundred-eighty days incarceration and a $100 fine, suspended, on each count; (2) case No. 98–CRB–00543, no days' incarceration and a $100 fine, suspended; (3) case No. 98–CRB–03198, one-hundred-eighty days' incarceration and a $250 fine, suspended, on each of two counts of telephone harassment; (4) case No. 98–CRB–03199, one-hundred-eighty days' incarceration and a $250 fine, suspended, on each of two counts of telephone harassment; (5) case No. 98–CRB–03200, one-hundred-eighty days' incarceration and a $250 fine, suspended, on each of two counts of telephone harassment; (6) case No. 98–CRB–03201, one-hundred-eighty days' incarceration and a $250 fine, suspended, on each of two counts of telephone harassment. The trial court ordered the sentences in case Nos. 98–CRB–03198, 98–CRB–03199, and 98–CRB–03201 to be served consecutively and pursuant to R.C. 2929.41, the aggregate term to be served not to exceed eighteen months.

Appellant timely appealed, assigning five assignments of error for our review.

## II

In his first assignment of error, appellant contends that there were not sufficient grounds to declare a mistrial in his first trial and, therefore, the Double

Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution precluded the city from prosecuting him a second time.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides: "* * * [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." This federal protection is applicable to the states through the Fourteenth Amendment. *Benton v. Maryland* (1969), 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707; *State v. Gustafson* (1996), 76 Ohio St.3d 425, 432, 668 N.E.2d 435, 441. Similarly, Section 10, Article I of the Ohio Constitution provides that "no person shall be twice put in jeopardy for the same offense." Jeopardy attaches when a jury is impaneled and sworn. *Crist v. Bretz* (1978), 437 U.S. 28, 98 S.Ct. 2156, 57 L.Ed.2d 24.

Here, there is no doubt that jeopardy had attached in appellant's first trial before the trial judge declared a mistrial because the jury had been impaneled and sworn. The question, therefore, is whether appellee was prohibited from retrying appellant by the constitutional prohibition against double jeopardy.

When a mistrial is declared, *sua sponte*, without the consent of the defendant after jeopardy has attached, retrial is prohibited unless (1) there is a "manifest necessity" or a "high degree" of necessity for ordering a mistrial or (2) "the ends of public justice would otherwise be defeated." *State v. Widner* (1981), 68 Ohio St.2d 188, 189, 22 O.O.3d 430, 431, 429 N.E.2d 1065, 1066, citing *Arizona v. Washington* (1978) 434 U.S. 497, 98 S.Ct. 824, 54 L.Ed.2d 717.

In evaluating whether the declaration of a mistrial was proper in a particular case, the Supreme Court of Ohio has "declined to apply inflexible standards, due to the infinite variety of circumstances in which a mistrial may arise." *State v. Glover* (1988), 35 Ohio St.3d 18, 19, 517 N.E.2d 900, 902, citing *Widner, supra*. Rather, the Ohio Supreme Court "has * * * adopted an approach which grants great deference to the trial court's discretion in this area, in recognition of the fact that the trial judge is in the best position to determine whether the situation in his [or her] courtroom warrants the declaration of a mistrial." *State v. Glover* (1988), 35 Ohio St.3d at 19, 517 N.E.2d at 902, citing *Widner, supra*. In examining the trial judge's exercise of discretion in declaring a mistrial, a balancing test is utilized in which the defendant's right to have the charges decided by the particular jury summoned to sit in judgment on him is weighed against the public interest in insuring that justice is meted out to offenders. *Id.*, citing *State v. Calhoun* (1985), 18 Ohio St.3d 373, 18 OBR 429, 481 N.E.2d 624. See, also, *United States v. Scott* (1978), 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65. "A defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest

in fair trials designed to end in just judgments." *Id.,* citing *Wade v. Hunter* (1949), 336 U.S. 684, 687, 69 S.Ct. 834, 836, 93 L.Ed. 974, 977.

■ Applying this test to the case at bar, we conclude that the trial court did not abuse its discretion in *sua sponte* declaring a mistrial and ordering a new trial on account of defense counsel's improper comments.

Prior to beginning the first trial, the city trial judge granted the city's motion *in limine.* Although the city had requested that the trial court preclude only evidence regarding appellant's post-traumatic stress syndrome and of the civil rights federal case, the trial court extended its ruling also to preclude any mention of appellant's military background. The trial judge then specifically instructed defense counsel not to make any mention of appellant's military background, his post-traumatic stress syndrome, and the civil rights lawsuit appellant filed in federal court. Nevertheless, after introducing himself to the jury during *voir dire*, defense counsel's first comment to the jury was, "My client is a totally disabled Vietnam veteran who has lost his hearing in his left ear." He then proceeded to ask the jurors whether they "could be fair to [appellant] because of his experience in the Vietnam War?" and informed them that "[appellant] was in the Marines. And received several purple hearts and other decorations." Despite a warning from the trial judge that he would complete the *voir dire* if defense counsel insisted upon asking inappropriate questions, defense counsel continued to do so.

The trial judge then again warned defense counsel that unless counsel asked appropriate questions, he would complete *voir dire:*

"This is well out of control. Mr. Lewandowski, approach the bench please. You have not asked a permissible question in the last ten minutes. I'm going to give you probably two more inches of line and then I'm going to ask you to sit down. None of these questions have anything to do with jury selection. Your indoctrination has gone well beyond what is permissible. So if you want to move on, you may move on. However, you are very close to being sat down. If you are going to keep asking these crazy questions."

Despite the trial court's warning, defense counsel continued to discuss topics that he had been instructed not to mention. Because of defense counsel's refusal to comply with its instructions, the trial court completed the jury *voir dire* for defense counsel.

When defense counsel gave his opening statement, he continued to discuss prohibited topics with the jury, contrary to the trial court's instructions:

"Thank you for your attention on this. This is the most important day in Ronald Baron's life. This case is about one thing. It is about power, raw power, it's about abusive power. It's the story of Broadview Heights versus Ronald

Baron. They have one goal in mind and that is to drive Ronald Baron from this community. At whatever cost. *They want to drive the Vietnam veteran from their community.*

" * * * This is what happened. *After serving his country in Vietnam,* Ron came home, married his high school sweetheart. * * * An incident took place in his life, that said what he vowed that he was going to move his family from Cleveland out to the suburbs, which was Broadview Heights.

"What happened is, his son was shot. The bullet ricocheted through his body * * * *Ron Baron was aware of what happens when a person dies because he had seen so much death in Vietnam.* * * *

"They used their money, their entire life savings, and they moved to Broadview Heights. * * * But Ron Baron made one mistake and that was he stepped on the toes of the people who were in power. The political leaders. And he did that by making a complaint that the property behind him that they were illegally turning that into a dump. A City dump.

"*Before Ron went to Vietnam he was really quiet.* * * * But when he came back * * * he learned how to speak his mind. * * * He said, 'Look, they're turning this into a dump. I don't care, do something about that.' And he stepped on toes from the City. The big toes of the people who were in power. We're talking about the top echelon here. And that was a mistake. So what they did is they got together and they said, 'We are going to drive you from that community.' And his life has been living hell.

"Some of the stuff that I'm going to tell you is so unbelievable, okay, this is what happens. * * * Every opportunity that Ronald Baron has, the City will try to turn that against him. *They accused him of making false alarms before. The jury acquitted him.*" (Emphasis added.)

Immediately after this comment, the trial judge declared a mistrial, concluding that defense counsel had "poisoned [the] jury to the point that I don't think I can rehabilitate it."

In light of the discretion afforded to the trial court regarding the declaration of a mistrial, we decline to reverse the trial court's ruling. Our review of the record indicates that, although the trial judge was perhaps too impatient with defense counsel, he properly concluded that in both *voir dire* and his opening statement, defense counsel repeatedly discussed matters with the jury that he had been specifically instructed not to mention. Further, we find it likely that defense counsel's inappropriate comments prejudiced the jury to such an extent that "the ends of public justice" could not be attained without discontinuing the trial.

Appellant's argument that the trial court should not have declared a mistrial because defense counsel did not mention appellant's post-traumatic stress syn-

drome or the federal lawsuit in his opening statement is without merit. In his opening statement, in defiance of the trial court's ruling regarding the city's motion *in limine*, defense counsel made repeated references to appellant's military service. Moreover, although defense counsel did not specifically mention the lawsuit appellant had filed in federal court, he commented about a prior case involving appellant and the city that had no relevance to the offenses at issue. Defense counsel's reference to the prior case was apparently designed to prejudice the jury by implying that the city was unnecessarily harassing appellant in bringing these charges, the very same claim appellant made in his federal lawsuit.

" 'The overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment.' " *State v. Abboud* (1983), 13 Ohio App.3d 62, 63, 13 OBR 66, 67, 468 N.E.2d 155, 156, quoting *Arizona v. Washington* (1978), 434 U.S. 497, 511, 98 S.Ct. 824, 833, 54 L.Ed.2d 717, 732. Accordingly, we conclude that the trial court did not abuse its discretion in declaring a mistrial and ordering a new trial on account of defense counsel's improper comments.

Appellant's first assignment of error is overruled.

## III

In his second assignment of error, appellant argues that the trial court violated his constitutional right to confront the witnesses against him by limiting his cross-examination of Grossnickle. Appellant asserts that, contrary to Grossnickle's testimony on direct examination, defense counsel did not listen to the original TEAC tape recordings of the harassing telephone calls made to the Broadview Heights Police Department on August 20, 23, and 29, 1998. Therefore, appellant contends, the trial court's ruling prohibiting any cross-examination on this issue was prejudicial because the jury was left with the erroneous impression that defense counsel heard the original tapes. In addition, appellant argues that he should have been allowed to cross-examine Grossnickle regarding the city's failure to produce the original TEAC tapes at trial, even though appellant had subpoenaed them.

Cross-examination is to be permitted on all relevant matters and matters affecting credibility. See Evid.R. 611(B). Evid.R. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. A trial court enjoys broad discretion in the admission and exclusion of evidence. That decision will not be

reversed absent a clear abuse of discretion which materially prejudices the objecting party. *State v. McCray* (1995), 103 Ohio App.3d 109, 658 N.E.2d 1076.

In the instant case, we find that the excluded evidence was directly relevant to one of the critical issues of the trial, i.e., whether appellant made harassing telephone calls to the Broadview Heights Police Department on the dates and times in question. Appellant contended throughout the trial that he did not make the telephone calls at issue and the cassette tape recording of the calls was a fabrication. He asserted that the original TEAC tapes, which show the date and time of each telephone call made to the Broadview Heights Police Department, would be exculpatory because they would show that it was impossible for him to have made harassing telephone calls to the police department on the dates and times in question. Therefore, the whereabouts of the original TEAC tapes and the reasons for their unavailability at trial were relevant evidence and a proper subject of cross-examination.

■ Moreover, the trial judge erred in finding that defense counsel did not have a good faith basis to challenge the authenticity of the cassette tape. The trial judge made its finding based on Grossnickle's testimony on direct examination that defense counsel had listened to the original TEAC tapes. However, upon questioning by the trial judge after the jury had been excused, Grossnickle admitted that he did not know if defense counsel had listened to the original TEAC tapes of the telephone calls at issue; he knew only that he had played some TEAC tapes for defense counsel. Accordingly, the trial court abused its discretion in prohibiting appellant's cross-examination of Grossnickle concerning whether defense counsel had listened to the original TEAC tapes of the harassing telephone calls, the whereabouts of the original TEAC tapes, and the authenticity of the cassette tape recording of the calls.

■ In light of the other evidence adduced at trial, however, the trial judge's error did not materially prejudice appellant. Both Hutchison and Kapitan, the dispatchers who took the calls, testified on direct examination that the cassette tape recording of the harassing telephone calls was a 100% true and accurate recording of the harassing calls they received on August 20, 23, and 29, 1998. Kapitan testified further that there was no doubt in [her] mind that the calls were made by appellant because she recognized his voice from other, legitimate telephone calls he had made to the police department.

Defense counsel had full opportunity to cross-examine these witnesses regarding their testimony but did not challenge their testimony regarding the authenticity of the cassette tape recording. In light of their testimony, whether or not defense counsel heard the original TEAC tapes and whether or not the original

tapes still existed was irrelevant and, therefore, the trial court's error in limiting cross-examination of Grossnickle was harmless.

Appellant's second assignment of error is overruled.

## IV

In his third assignment of error, appellant argues that the trial court's actions and comments throughout his first and second trials prejudiced his constitutional right to a fair and impartial trial.

■ The judiciary must remain detached and neutral in any proceeding before it. *State v. Bayer* (1995), 102 Ohio App.3d 172, 174, 656 N.E.2d 1314, 1315. Although there is no absolute prohibition to preclude a judge from commenting during a trial, the judge must bear in mind that his or her influence on the jury can be, and properly is, of great weight. *State v. Thomas* (1973), 36 Ohio St.2d 68, 71, 65 O.O.2d 216, 218, 303 N.E.2d 882, 884. Juries are highly sensitive to every remark made by the trial judge, who is the ultimate authority in the courtroom. *Id.*

■ When a trial judge asks questions or makes statements in the course of a criminal trial within the hearing of the jury, the questions or comments may be construed as an expression of opinion on the part of the judge concerning the credibility of a defendant or a witness, or his or her opinion as to the facts of the case. Prejudicial error may result when the jury believes that the trial judge has an opinion in the case. *State v. Kay* (1967), 12 Ohio App.2d 38, 49, 41 O.O.2d 91, 98, 230 N.E.2d 652, 660. Thus, in a jury trial, "the court's participation by questioning or comment must be scrupulously limited, lest the court consciously or unconsciously indicate to the jury its opinion on the evidence or on the credibility of a witness." *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 50 O.O.2d 322, 256 N.E.2d 613, paragraph three of the syllabus.

In *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph two of the syllabus, the Supreme Court of Ohio held that "[c]hallenged statements and actions of the trial judge in a criminal case will not justify a reversal of the conviction, where the defendant has failed in light of the circumstances under which the incidents occurred to demonstrate prejudice." In *Wade,* the Ohio Supreme Court set forth five factors for reviewing courts to consider in determining whether a trial judge's actions and remarks were prejudicial: (1) the burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and

(5) the possible effect of the remarks on the effectiveness of counsel is to be examined. *Id.* at 188, 7 O.O.3d at 365, 373 N.E.2d at 1248.

Appellant has not carried his burden of showing that the trial judge's remarks prejudiced his defense. Although appellant contends that the trial court took control of *voir dire* from defense counsel and then made disparaging remarks about defense counsel in the presence of the jury before he discharged the jury in the first trial, appellant cannot demonstrate any prejudice as a result of these actions because the jury was discharged before deciding the merits of the case.

Appellant also contends that the trial judge's comments throughout the second trial indicated a bias against him and his counsel. Appellant complains that before the trial started, the trial judge made disparaging remarks about defense counsel's legal competence when informing him that the court had again granted the city's motion *in limine* to preclude any mention about appellant's military background or post-traumatic stress syndrome. Appellant also complains that the trial judge berated defense counsel and questioned his integrity during the trial when he informed counsel that he could not continue to cross-examine Grossnickle about the authenticity of the cassette tape that Grossnickle had made. Appellant complains that the trial judge's bias against him was also apparent when the trial judge instructed appellant that he would hold him in contempt and continue the trial without him if he continued to be disruptive in the courtroom. None of these comments was made in the presence of the jury, however. Moreover, our review of the record indicates that in each instance, the conduct of appellant or his counsel warranted an instruction from the judge. Furthermore, in each instance, the trial judge permitted defense counsel to make an objection for the record to preserve his client's appellate rights. Thus, we find that appellant has failed to demonstrate that these remarks were prejudicial to his defense.

Appellant complains that the trial judge's impatience with him and his counsel was apparent to the jury when the trial judge, in the presence of the jury, discontinued defense counsel's cross-examination of Sergeant Kopniske, stating that counsel had asked the same question time, and "time, and time again." The record indicates that defense counsel had, in fact, repeatedly asked the same question of Sergeant Kopniske on cross-examination. The trial judge had sustained many of the prosecutor's objections to defense counsel's questions and instructed defense counsel to ask a proper question. When defense counsel then insisted upon asking the same question again, despite the trial judge's warning, the trial judge limited counsel's cross-examination.

Although the remark may have been mildly intemperate, our review of the record indicates that, in light of the circumstances in which the remark was made, there was no prejudice to appellant. After a thorough review of the entire trial transcript, we conclude that the judge's comments during trial which appellant objects to constituted efforts to keep the trial within reasonable bounds and/or were induced by the behavior of counsel.

Evid.R. 611(A) recognizes the trial court's authority to exercise control over the courtroom.[1] Considering the criteria set forth in *Wade, supra,* we conclude that, within the context of the proceedings, the trial judge's comments represented the proper exercise of his authority to maintain order in the courtroom or monitor the presentation of evidence in accordance with Evid.R. 611 and were not prejudicial to appellant.

Furthermore, although we find no prejudice, any potential prejudice to appellant was offset by the trial court's instruction which cautioned the jurors against being influenced by any impression they had of what the trial judge thought. Appellant's argument that the trial court's actions and comments denied him a fair trial is therefore not well taken.

Appellant's third assignment of error is overruled.

## V

In his fourth assignment of error, appellant argues that given his military service and medical and psychiatric conditions, the sentence imposed by the trial court "is so disproportionate to the crime that it violates the constitutional protection against cruel and unusual punishment." This argument is not well taken.

Appellant was convicted of twelve misdemeanors of the first degree and one minor misdemeanor. He was sentenced pursuant to R.C. 2929.21, which provides that terms of imprisonment for a misdemeanor of the first degree shall not exceed six months and fines shall not exceed $1,000. R.C. 2929.21 further provides that there is no term of imprisonment for a minor misdemeanor and a maximum fine of $100. Pursuant to R.C. 2929.41, consecutive terms of imprisonment imposed for misdemeanors shall not exceed an aggregate term of eighteen months.

---

1. Evid.R. 611(A) provides: "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to 1) make the interrogation and presentation effective for the ascertainment of the truth, 2) avoid needless consumption of time, and 3) protect witnesses from harassment or undue embarrassment."

Generally, if a sentence falls within the terms of a valid statute, it cannot amount to cruel and unusual punishment. See *McDougle v. Maxwell* (1964), 1 Ohio St.2d 68, 69, 30 O.O.2d 38, 39, 203 N.E.2d 334, 336. "[P]unishments which are prohibited by the Eighth Amendment are limited to torture or other barbarous punishments, degrading punishments unknown at common law, and punishments which are so disproportionate to the offense as to shock the moral sense of the community." *Id.* at 69, 30 O.O.2d at 39, 203 N.E.2d at 336. See, also, *State v. Chaffin* (1972), 30 Ohio St.2d 13, 59 O.O.2d 51, 282 N.E.2d 46, paragraph three of the syllabus.

Here, the trial court followed the sentencing scheme set forth by the General Assembly and sentenced appellant to an aggregate term of eighteen months of imprisonment on twelve counts of misdemeanors of the first degree. All of the fines imposed by the trial court were suspended. Considering the nature of the offenses, we cannot say that appellant's sentence was disproportionate or shocking to the moral sense of the community.

Appellant's fourth assignment of error is overruled.

## VI

In his fifth assignment of error, defense counsel contends that the trial court erred in finding him in contempt of court and fining him $500. We decline to consider this argument, however, because defense counsel does not have standing to raise this issue in this appeal.

"It is an elementary concept of law that a party lacks standing to invoke the jurisdiction of the court unless he has * * * some real interest in the subject matter of the action." *State ex rel. Dallman v. Court of Common Pleas* (1973), 35 Ohio St.2d 176, 179, 64 O.O.2d 103, 105, 298 N.E.2d 515, 517. A party has a "real interest" where the party is directly benefitted or injured by the outcome of the case. *W. Clermont Edn. Assn. v. W. Clermont Bd. of Edn.* (1980), 67 Ohio App.2d 160, 162, 21 O.O.3d 457, 458–459, 426 N.E.2d 512, 514.

The subject matter of this case concerns the criminal liability of appellant. Thus, defense counsel has no real interest in the outcome of this case and, therefore, lacks standing in this appeal to challenge the trial court's order finding him in contempt of court.

Accordingly, we will not consider appellant's fifth assignment of error.

*Judgment affirmed.*

KARPINSKI, P.J., and SPELLACY, J., concur.