THE STATE OF OHIO, APPELLEE, *v.* KAY, APPELLANT.

[Cite as State v. Kay, 12 Ohio App. 2d 38.]

(No. 27888—Decided October 26, 1967.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. Leo M. Spellacy,* for appellee.

*Mr. Richard B. Kay, in propria persona.*

CORRIGAN, C. J. Defendant, a practicing attorney, prosecutes this appeal on questions of law from his conviction by a jury on two counts of a bribery indictment in the Court of Common Pleas of Cuyahoga County.

That indictment charged that he, on or about April 3, 1963, did unlawfully and corruptly promise, offer, and give one hundred dollars to one Thomas Dow, a duly appointed, qualified and acting officer, agent and employee of the state of Ohio, Department of Highways and Division of Right of Way, with intent to corrupt and influence Thomas Dow in the discharge of his public duties, actions, opinions and judgment, in a matter pending, or that might legally come before him, particularly the appraisal of certain real property, to be made by Thomas J.

Dow for and on behalf of the state of Ohio, Department of Highways and Division of Right of Way. The second count charged a like offense on April 5, 1963.

Defendant urges fourteen assignments of error. We have reviewed and carefully considered each of these claims of error in the light of the evidence as reflected by the bill of exceptions, and we find that assignments 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 13 and 14 are unmeritorious and they are therefore overruled.

Taking up the remaining two assignments of error, we first consider number 8 which recites that:

"The court showed bias and prejudice against the defendant by making various comments on the evidence in the presence of the jury which constituted misconduct by the court and was prejudicial to the defendant since it tended to and did influence the jury adversely against the defendant."

Defendant invites attention to a number of instances during the trial where the court, in connection with the examination or cross-examination of witnesses, participated unnecessarily and to the prejudice of defendant. We deem it of importance to list each of these instances as reflected in the record.

1. During cross-examination of Thomas Dow, chief witness for the state, questioning was centered on the fact that Dow signed a letter on a date varying from the date reflected on the letter.

"Q. You did not sign it on the 2d as the letter alludes to, did you? A. No.

"Q. So that's a false representation, isn't it?

"Mr. Spellacy. Objection to the argument of counsel.

"The Court: Mr. Cooper, it is a question but it is not a question when you say false representation. Now we frequently sign papers and letters today that perhaps the secretary typed two days ago."

2. During the further examination of witness Dow, the following colloquy occurred:

"Q. There are only two times you had any personal—by that I mean like we are here together—that was the only time you had any personal contact, and Risman was there with you every time, wasn't he? A. Yes.

"Q. And further, you say that Mr. Kay told you that Mr. Risman was a millionaire, is that right? A. Yes,

"Q. In front of Mr. Risman, is that correct? A. I don't recall whether Mr. Risman was there or not.

"Q. Weren't you both there together, all three of you there together and he said that right there in the office, Mr. Dow?

"Mr. Spellacy: Objection your Honor.

"The Witness: He did not say—

"The Court: Just a moment, Mr. Dow.

"When there is an objection hold your answer for a second until I rule on the objection.

"There was testimony that Mr. Risman excused hmiself on a few occasions. The objection is sustained.

"Mr. Kane: Your Honor, I am going to object to the Court's comments. That happened once before when you explained that people do sign letters that are dated at some other date than the actual date of the signing.

"I do want to object to the Court's comments.

"The Court: Tell me, Mr. Kane, didn't the witness testify that Mr. Risman went out the first time to the men's room and the second time to the parking lot to view his automobile, yes or no, sir?

"Mr. Kane: Your Honor, whether there was any conversation while he was gone, nobody knows. I don't think the Court should say that there could have been some conversation and this could have been said while he was gone.

"Mr. Spellacy: I object, your Honor.

"Mr. Kane: I am just objecting to the Court's comments. "* * *

"The Court: Mr. Kane, I accept your objection to me, I have no quarrel.

"The question implied that all three men were together all the time. Now, it is conceivable that Mr. Kay said to Mr. Dow that Risman was a millionaire at a time when Mr. Risman was not present. It is not true that they were all together all the time.

"The objection is sustained. Please proceed."

3. On direct examination of defendant Kay, the following exchange took place:

"A. There are $20 bills that are—I assume

"The Court: Just tell Mr. Cooper what is in the envelope.

"Q. What is in the envelope? A. There are $20 bills, it looks like $20 bills.

"The Court: Not what they look like, aren't there five $20 bills in there? A. No, sir, I don't know.

"The Court: Look at it, Mr. Kay. A. I am looking at it.

"The Court: You can't tell me those are five $20 bills? A. They could be counterfeit. I don't know. I am not an expert on money. There are five bills here that look like they are $20 bills, yes.

"The Court: Mr. Kay, just answer the question. A. Yes, sir, there are $20 bills that look like $20 bills, five $20 bills legal tender.

"* * *

"Q. Then did you remain there, [alluding to time spent at city jail] you remained there till when? A. It seemed hours. I would say maybe—

"Mr. Spellacy: I object.

"The Court: Mr. Kay, you are not making an honest effort, in my opinion, to abide by my request that you answer the questions.

"The Witness: I am sorry, your Honor, exactly I don't know.

"The Court: I want to go a little further, because I don't want to interrupt you again and have to say this. After all, you have been in a court room before, you understand the rules of procedure. I don't think you're honestly making a concentrated effort to abide by what I asked you to do namely, answer the questions, because if you will it will save the need of objections.

"The Witness: All right, your Honor.

"* * *

"A. Close to the starting of the fall term of the Criminal Court [alluding to his (Kay's) meeting with Risman and his attorney], because it was another feeling at that time that I was going to trial.

"Mr. Spellacy: I'm going to object.

"The Witness: Excuse me.

"The Court: Can't you give us an approximate date?

"The Witness: Just before Labor Day.

"The Court: Can't you give us an approximate date?

"The Witness: It must have been the latter part of August, Judge.

"The Court: Can we have an approximate date?

"The Witness: Maybe the 25th of August.

"The Court: Then the meeting took place approximately August 25, 1963, is that the answer?

"The Witness: I don't know.

"The Court: Isn't that the answer, the meeting took place approximately August 25, 1963?

"The Witness: I don't know, your Honor.

"The Court: You are still insisting, Mr. Kay, why don't you just answer the question that Mr. Cooper asked?

"When you answer it by saying approximately August 25, 1963, we allow it might have been the 24th or for that matter the middle of July, or it could have been in November. You are giving us your best judgment of approximately August 25, 1963, is that right?

"The Witness: Yes, your Honor."

4. The following took place during cross-examination of defendant Kay:

"Q. And you told them [State] if the State did not purchase the property at this time you were going to file your mandamus action, is that right? A. I was instructed by my client to file it, yes, sir.

"The Court: Is that what you told Mr. Rusnov? A. Exactly what I said, but my client—

"The Court: That's not what you just said."

5. The last rhetorical dialogue cited by appellant relates basically to a semantic interpretation of the words "appropriation case." The record reads as follows:

"A. No, sir, I said that they were going to take it under advanced appropriation so I wouldn't have to file a mandamus action, for which I had been retained.

"The Court: At that point, then, you were representing Mr. Risman in an appropriation action?

"The Witness: No, sir, because when you—

"The Court: When you called Mr. Dow, did you know he was here in Cleveland or at the York Motel for the purpose of making an appraisal of that property, yes or no?

"The Witness: Yes, sir.

"Q. You don't make an appraisal in a mandamus case, do you?

"* * *

"Q. Now when you sat at that table you had State's Exhibit 3 in your possession, isn't that right? A. I had a folder in my possession, yes, sir.

"The Court: Just so we understand, the folder looks like a lot of other folders? A. Yes, sir.

"The Court: It is generally the same size, the cuts are the same, and this is the same color.

"So we understand, let's assume this was the folder, but quite conceivably it could be another folder, so we eliminate that problem from now on, and the same applies to the money.

"* * *

"Q. So you knew there was going to an appropriation case, isn't that right? A. No, sir.

"Q. And you asked Mr. Dow to please check.

"The Court: Mr. Spellacy, let's see if we can get this straight.

"Mr. Spellacy: Yes, your Honor.

"The Court: An appropriation case to you is a case when you appropriate title, is that right?

"The Witness: Not entirely, your Honor.

"The Court: That is when you consider it a case?

"The Witness: Not entirely, your Honor.

"The Court: Tell me more.

"The Witness: An appropriation case is when an appraiser for the state of Ohio or some fee appraiser makes an appraisal on a piece of property and submits it to the property owner, and the property owner is not satisfied with the appraisal, then he turns it down. This appraisal is sent to the State Highway Department, and under the law there must be spread upon the records of the Director of Highways a finding setting forth that the state of Ohio needs this property, and that the state of Ohio feels the property is worth so much money.

"This finding of the Director of Highways then—

"Mr. Spellacy: Judge, I'm going to object to this.

"The Court: Let him do it, if you will, because we have spent more time on what is an appropriation case and what isn't.

"Please bear with me, if you will.

"The Witness: Now, this finding of the Director of Highways is sent to a member of the Attorney-General's staff in the area where the property is to be taken, the Attorney-General prepares a pleading, and it is called an appropriation in re the property of Bill Smith.

"This case is then taken down to the Court of Common Pleas and filed.

"At that point there is an appropriation case, and until that point there is no appropriation case. At that moment is generally the time an attorney is retained to represent the property owner in an appropriation case, and not till that moment.

"The Court: Mr. Kay, not long ago I said to you, because you testified to this previously, and this calls for a yes or no answer.

"Do you consider an appropriation case an appropriation at the time it is prepared and filed? I take it by what you just said that your answer would be yes.

"The Witness: Yes, your Honor.

"The Court: Would you agree that frequently the state of Ohio and the property owner do arrive at a price of mutual satisfaction and that no appropriation case is ever filed?

"The Witness: That's correct.

"The Court: Would you agree that frequently the property owner retains a lawyer to negotiate this eventual settlement?

"The Witness: Frequently, no, sir.

"The Court: Would you agree that sometimes they do?

"The Witness: Probably they do, yes, sir.

"The Court: Well, if I suggest to you that I have represented property owners in appropriation matters in which the state of Ohio never filed a pleading, would you agree with that because I said so?

"The Witness: If you said so, yes, sir.

"The Court: Do you ever do anything like that?

"The Witness: No, sir.

"The Court: What would you call the case during its period of negotiation prior to its preparation and filing?

"The Witness: I don't know, your Honor, because the only time I have ever represented a client is after a case has

been filed, and they come up and retain me after the State has appraised it and they are not satisfied; then they come and retain me in an appropriaton case.

"The Court: May I suggest to you, Mr. Kay, an appropriation case is an appropriation case at the time the property owner and the state of Ohio realizes that there is a problem between them, that is when it is an appropriation case, in the same sense of any other kind of a case.

"The Witness: In my judgment, no, your Honor.

"The Court: You are welcome to disagree with me.

"For the purpose of discussion here with Mr. Spellacy, an appropriation case was in existence at the time that there was discussion between the state of Ohio and the property owner and/or his attorney.

"The Witness: There was a possibility, yes, your Honor.

"The Court: Now, for the sake of our question here, we are going to call it an appropriation case.

"The Witness: I can't, your Honor, because I have been told that until Columbus approves of this, and made a final determination on the center line being set, they might never take the property, so then there is no appropriation.

"The Court: Well, there are appropriaton cases that don't become appropriation cases because the negotiation terminates because the state decided not to exercise the appropriation.

"The Witness: I am not going to call it that.

"The Court: What do you want to call it? Before the case is filed, what do you want to call it, call it whatever you wish, give it a name.

"The Witness: I would say, your Honor, that this was a situation where, until the state of Ohio formally, through the Director of Highways, made a determination that they were going to take this property, because we never knew whether they were actually going to appropriate. They could have appraised the property, it could have been sent to Columbus, and no letter would have been sent saying that they are going to take this property, and there would have never been an appropriation.

"I feel until the center line is set and the Director makes a finding, there is no appropriation.

"The Court: Mr. Kay, if we have to stay here till 10:00 o'clock tonight, we are going to go as far as we can go on this particular testimony.

"And to you, Mr. Spellacy, I have to agree with you, I am sorry I ever started the question.

"Please proceed."

A careful consideration of the foregoing remarks of the trial court, taken in each individual example quoted and then collectively, fails to evince an aura of pure impartiality. The court in the first instance creates the atmosphere in the trial courtroom and then maintains it or otherwise. The determining factor in connection with this assignment of error is whether the interpolations, comments and questions by the court below interfered with the defendant's constitutional right to a fair trial.

The case which seems to be most germane to this question is *State* v. *Lawrence*, 162 Ohio St. 412. The defendant was found guilty of manslaughter, a jury trial having been waived. The Supreme Court held that the defendant was unconstitutionally deprived of due process when a judge, assuming that the defendant's witnesses were not telling the truth, intervened repeatedly on direct examination and on cross-examination, asking questions and cross-examining them, while threatening incarceration if they did not speak up and answer the questions with truthful statements. Notwithstanding the fact that a jury was waived, the opinion sets forth pertinent criteria for the court's conduct of a case as follows (concurring opinion by Lamneck, J., page 415):

"A judge's official actions upon the bench should be free from impropriety or the appearance of impropriety. It is his duty to require courteous conduct on the part of all court officers towards jurors, witnesses, litigants and others having business with the court. Likewise, if the integrity of and the respect for our courts are to be maintained, a judge must also be patient and courteous in controlling the proceedings of the court. He, himself, more than any other person, must fearlessly observe the fundamental restrictions that have been established by law and custom to guarantee that the rights of litigants, witnesses and others will always be observed.

"Our state and federal governments have been divided into three separate departments, viz., the legislative, the executive and the judicial. Our forefathers wisely lodged the protection of the rights of free men in our judicial department. This protection can only be maintained by rigorously observing the limitations that restrain those in authority who would violate our sacred and constitutional guaranties. Judges must have a deep and reverent purpose to faithfully and impartially discharge the duties which rest upon them to the end that our free institutions will always be preserved and handed down unimpaired to our posterity.

"When counsel for the defense was presenting his case, the long established rules regarding the interrogation of witnesses were not observed as they should have been. It is not proper for a court, in a criminal case, to intervene when counsel is examining a witness on direct examination and, before such direct examination has been concluded, to cross-examine such witness on the assumption he is not telling the truth.

"Canon 15 of the Canons of Judicial Ethics, adopted by this court on January 27, 1954, provides in part:

" 'A judge * * * should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses, especially those who are excited or terrified by the unusual circumstances of a trial, may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto.'

"The motives and integrity of the trial judge in any case that is or has been before this court are not and have not been in question. It is always assumed and granted that a trial judge's objective is to be impartial and that he endeavors 'to administer justice without respect to persons.' What is said herein, or what may have been said inadvertently in any previous opinion of this court, is not to be construed otherwise. A judge is to be commended for any determination displayed by him to enforce the law and to secure the truth. But in doing so, the long established rules of courtroom procedure in criminal cases must be followed, at least to the extent that the rights of a defendant will not be prejudiced thereby."

The *per curiam* opinion, to which Lamneck, J., wrote his concurring opinion, *supra*, shows that "during the *direct* examination the court interrupted to say:

" 'The Court. Counsel has asked you to speak up. I have asked you to speak up. You say you are not afraid. I can correct that for you very quickly, if you would rather go to jail until you decide to talk louder so we can hear you; you make up your mind whether you want to speak up or whether you don't; what do you want to do? A. I will speak.'

"After a study of the foregoing excerpts and the entire record, the very least that can be said is that the atmosphere of the trial was such as to fall far short of the plain requirements of the law. Hence, it is the manifest duty of this court to reverse the judgment and remand the cause to the Court of Common Pleas for a retrial in conformity with the fundamental rights of every person charged with a crime."

That case is followed in *Surgeon* v. *Surgeon,* 165 Ohio St. 233, which was a divorce case wherein the court's questions and comments interfered with the right of defendant to have a fair and impartial trial.

At one point in the instant trial, quoted *supra,* the court stated that the defendant was not making an honest effort to abide by the court's request to answer questions. Then the court repeated this opinion that it did not think the defendant was honestly making an effort to answer the questions. All of this was in the presence and hearing of the jury. That jury had the exclusive function to determine what credibility would be given to the defendant's answers. It was not proper for the court to invade the jury's province in this area. We are fully aware of the weight a juror or jurors would probably give to any indication of the feeling of the court on this most important question of credibility of the defendant.

We do recognize the right of a trial judge to interrogate a witness as long as he confines his questions to matters that are relevant and does not by his inquiries or his comments show or even suggest that he holds views favorable to one side or the other, or that he mistrusts a witness, so that the jury's conclusions as to the credibility of witnesses and the evidence, and not the judge's views or his attitude in asking questions, are the only basis for the jury's verdict. The court, of course, has the

obligation to control proceedings, to clarify ambiguities, and to take steps to insure substantial justice. However, the degree of participation of the judge in the questioning may vary with the nature of the case. In criminal trials before juries, the court's participation must be scrupulously limited lest it consciously or unconsciously indicate an opinion on the evidence or on the credibility of a witness to the jury.

Statements made by a trial judge during the progress of a trial and within hearing of the jury are of the same effect as though embodied in the charge to the jury, and, where such remarks or questioning may lend themselves to being interpreted as an opinion on the part of the judge as to the credibility of witnesses or of a defendant or an opinion on his part as to the facts of the case, prejudicial error results. See, *Hazen* v. *Morrison & Snodgrass Co.*, 14 C. C. (N. S.) 483, 23 C. D. 512.

After a study of the foregoing excerpts, together with the entire record, we are of the opinion, and we so hold, that the defendant's right to a fair and impartial trial was interfered with by some of the questions and comments of the trial judge, and, therefore, that assignment of error No. 8 is well taken as being prejudicial to the substantial rights of defendant.

We now consider assignment of error No. 12 which reads:

"The court over objections of the defendant permitted only 45 minutes for final arguments when after eight days of trial it was an abuse of discretion and prejudicial to the rights of the defendant to allow only 45 minutes for final argument."

The general rule regarding limitation of time for argument is stated in 53 American Jurisprudence 364, Trial, Section 461:

"In both civil and criminal prosecutions the time allowed counsel for argument is within the sound discretion of the trial court, the exercise of which will not be interfered with by an appellate tribunal in the absence of a clear showing of its abuse to the prejudice of the substantial rights of the complaining party. The only limitation upon the discretion of the court to limit the length of arguments, however, is that the time given must be reasonable and of such length as not to impair the right of argument or to deny a full and complete defense. * * *

"No precise rule can be laid down as to the time limit to which the trial court may properly restrict the argument of counsel, since what might be a reasonable limitation in one case

would unquestionably be unreasonable in another. Whether the discretion of the court has been properly exercised depends entirely upon the circumstances of each case, the number of witnesses examined, the volume and character of the evidence, the time consumed in the trial of the case, as well as any other matters which properly have a bearing upon the time necessary to present the case fully to the jury. * * *''

See, also, 88 Corpus Juris Secundum 333, Section 168.

In *Dille* v. *State,* 34 Ohio St. 617, the court limited argument to 30 minutes in a case where defendant was convicted on a burglary and larceny charge. The court said in its opinion (page 619):

"The only question that will be noticed in this case is, did the court err in limiting the two counsel of the defendant to thirty minutes for the argument of the cause to the jury?

"The question is an important one. The three most important constitutional rights which a person accused of felony has, are, (1) a trial by jury, (2) compulsory process for obtaining witnesses in his favor, and (3) the assistance of counsel on his trial.

"* * *

"There were seven witnesses for the state, and four for the defendant. Half a day was occupied in taking the testimony. It was entirely circumstantial, and there was serious conflict in it. Under these circumstances, when the defendant's liberty was at stake, and an ignominious punishment threatening him, he was entitled to be heard, in a reasonable manner, by both counsel whom he had employed for his defense. His counsel sufficiently indicated that in their judgment the thirty minutes allowed for argument was insufficient, by promptly protesting against it, and the defendant saved his right by excepting to the limitation at the time it was imposed. Finding, as a majority of us do, that the limitation upon the argument was such an abuse of the power of judicial control over the subject, as deprived the defendant of a fair trial, the judgment must be reversed, and cause remanded for a new trial."

A further question arising here is whether the action of defendant's attorneys, by agreeing to limitation of argument, amounted to a waiver. When the circumstances are such where the defendant strenuously objects to the limitation of argument

time, albeit counsel has consented to such limitation, such action of his attorney cannot be construed to be a waiver. See 6 Ohio Jurisprudence 2d 53, Attorneys at Law, Section 32, which states:

"* * * But while counsel of record may generally bind his client, he cannot do so to his client's disadvantage, when it is obvious that he does not speak for his client, and what he does say indicates no waiver of his client's rights."

It should be recorded here that the bill of exceptions shows that the court sets forth the following on this question:

"The Court: It is now 1:45 and we are about to commence argument, and following that would be the charge. Based upon the time schedule of yesterday we would expect each, prosecution and defense to have 45 minutes, a total of an hour and a half. The court's charge will be approximately forty-five minutes which will mean about 4 o'clock the jury will get the case. This is the last day of the week in that tomorrow is a holiday, this is Thursday and Friday is a holiday. This is the last day of the jury's term in this office. The jurors will be required to return Monday, which would be an inconvenience to them. The court has scheduled on Monday a first degree murder case and the venire has been summoned, plans have been made to proceed. The prosecutor has a case scheduled for Monday and I don't know what the obligations of the defense counsel are. In any event it was agreed yesterday at side bar off the record that the argument would be limited to 45 minutes. The court made no recommendation in this regard. The court simply asked the lawyers what was their pleasure and they suggested 45 minutes would be adequate. Go ahead, Mr. Kay."

It must be submitted that such matters should have no bearing whatsoever on the duration of closing argument in a criminal trial.

It should be noted that defendant, Kay, a member of the Bar, was to and did participate in the final argument. The record shows that he objected strongly to the limitaton of time to forty-five minutes a side for final argument.

Looking to the particular facts in this case, i. e., eight days of trial, the seriousness of the offense charged, and the reasons given by the court as reflected by the record, the arbitrary limitation of defendant's closing argument time to forty-five min-

utes was an abuse of discretion in this case and constituted error. Standing alone, such error might not warrant reversal, but considered with assignment of error No. 8 above, we are of the opinion it was prejudicial.

For the reasons given, the judgment of the Court of Common Pleas is reversed, and the cause is remanded to that court for further proceedings according to law.

*Judgment reversed.*

SILBERT and ARTL, JJ., concur.