On this appeal from a guilty verdict following a jury trial before Judge Daniel Gaul, I dissent and would reverse and remand on assignments of error one, two, three, four, and eight, and find assignments of error five, six, and seven moot.
In addition to the facts stated by the majority, a number of further facts bear statement: At about one o'clock a.m. on February 5, 1994, twenty-three-year-old Shareece Scott was shot in the face and killed on East 83rd Street between Cedar and Central Avenues in Cleveland. Dennis King, a witness who was in the area at the time, observed Ms. Scott speaking to someone in a small, gray car just before hearing the gunshot. King testified that he believed there were three people in the car, although he did not look closely at the car or its occupants.
At trial, then thirty-three-year-old Andrew Starr stated that in 1994 he had been working as a firearm refinisher and was introduced to Matthew Stedman for business reasons, because Stedman also had an interest in firearms, and that Stedman introduced him to George Ciobotaru and James Potasiewicz. Starr testified that within a few months of their meeting, Stedman confided to him that he and Potasiewicz had shot a prostitute near the Cleveland Clinic, and expressed concern that Potasiewicz would go to the police. When asked if Stedman told him who did the shooting, Starr replied, "I believe he said he did." When asked what Ciobotaru knew about the murder, Starr testified, over objection, that Ciobotaru's story was consistent with what Stedman had earlier told him.
On cross-examination Starr admitted that, even though he had served a twenty-month sentence for federal weapons charges, he had been informed that he was still subject to more serious federal charges — concerning the manufacture of automatic weapons — if he did not testify at Stedman's trial. He also testified that his memory of his 1996 statement was "very vague," and that his knowledge of most of the details of the murder came from someone other than Stedman.
Ciobotaru testified that when he was approached by FBI Agent Phillip Torsney and Cleveland Police Detective Gary Garisek in November 1996, he made a statement against Stedman, his childhood friend, because he was afraid he would be incarcerated as a probation violator if he did not, and because Stedman had disappeared and he believed he would never return. He testified he felt coerced and that he told the officers what they wanted to hear — that Stedman had admitted the killing — to avoid further trouble. The judge interrupted Ciobotaru's testimony, and told him that if he did not testify consistent with his 1996 statement, the judge would personally see to it that he was referred to the county prosecutor for perjury charges. After the warning, Ciobotaru continued to maintain that his statement was coerced, and that he could not remember whether Stedman had admitted the murder to him. He contended that he heard accounts of the murder from as many as thirty different people and, though he knew the details, could not recall the source of his knowledge.
Potasiewicz, twenty-nine years old at the time of trial, testified that in 1994 he and Ciobotaru worked together at a computer company, and that he rented a room in Ciobotaru's house. He met Stedman, who also worked at the computer company, through Ciobotaru. Potasiewicz testified that after the murder, Stedman joked about the woman's last words, "What's up baby," and that Stedman told Ciobotaru and his girlfriend about the killing the same night.
Potasiewicz testified that within a few days, Stedman told him that no one else needed to know about the murder, a statement he took as a threat but, nevertheless, he told Tom Piezheimer, a co-worker, and the story quickly became common knowledge among the group's friends and acquaintances. On cross-examination, Stedman's lawyer sought to establish that Potasiewicz had committed the murder and implicated his client only after law enforcement officials began questioning him about it. Potasiewicz admitted that he did not volunteer information about the murder when government agents first asked him about Stedman's weapons dealing, and only when confronted with Starr's allegations in November of 1996 did he speak about it. He claimed he did not go to police sooner because he was afraid that Stedman or his friends would take revenge.
On the second day of trial, Stedman moved to exclude evidence of his being found and arrested in Thailand, his false passport, and his assumed name, claiming that such evidence would improperly be used as evidence of his guilt. The judge overruled the objection as untimely, and the State then presented extensive evidence of Stedman's travels as a fugitive from justice and the efforts of government and international agents to locate him, introduced evidence of the unrelated arson charges against him, arguing that Stedman did not want to be taken into custody for any reason because he feared that he would ultimately be prosecuted for Ms. Scott's murder.
Finally, over Stedman's objection that the witness had not been identified in discovery responses and that his testimony was irrelevant, the State called Robert Nemeth. The State argued that it had faxed Nemeth's name to Stedman's lawyer after trial started, but he denied receiving the fax. After the defense was given a brief opportunity to interview him, Nemeth testified that in 1993 and/or 1994 he and Ciobotaru would harass prostitutes in an area near East 40th Street and Cedar Avenue by stopping the car and, when the women approached, driving away. Contrary to the majority's statement of the facts, Nemeth stated that Stedman had joined them in this activity on one occasion — he didnot state that "he, Ciobotaru, and Stedman would go out drinking in the Flats" and afterwards drive around harassing prostitutes — he testified that he and Ciobotaru engaged in this activity repeatedly, and that Stedman accompanied them on one occasion.
Although he presented no witnesses in defense, Stedman argued in closing that he was a convenient scapegoat for Starr and Potasiewicz, who had both received concessions from government officials in return for their statements and testimony. The State argued that Stedman fled the country to avoid prosecution for the murder, and pointed to the consistencies among the testimony of Starr, Ciobotaru, and Potasiewicz as convincing evidence of his guilt. In support of his assertion that the evidence was substantial, the prosecutor stated that "we submit to you that what we have presented to you is sufficient and we could explain to you later why every single person that may have heard about this was not called as a witness."
Stedman asserts his first three assignments of error through his appointed lawyer, and states five more pro se, through this court's grant of his motion to file a supplemental brief. The first assignment of error states:
 I. THE TRIAL COURT ERRED BY ALLOWING A STATE WITNESS TO BOLSTER HIS CREDIBILITY THROUGH THE USE OF HEARSAY.
Starr testified that Stedman admitted shooting Shareece Scott and, over objection, that Ciobotaru's account was consistent with what Stedman told him, and that Ciobotaru did not tell him anyone else had done the shooting. The evidentiary question before us is whether Starr testified to "assertions "made by Ciobotaru, and if so, whether those statements were introduced to prove the truth of the matters asserted. Evid.R. 801.
The majority states that because Starr only testified that Ciobotaru's statements were "consistent" with those made by Stedman, the statements had no content, and thus contained no matters to assert. This ignores the fact that unless Ciobotaru's statements are taken as assertions, Starr's testimony about them is irrelevant. By stating that Ciobotaru's statements were consistent with his testimony, he essentially testified to the contents of the statements. Similarly, by stating that Ciobotaru did not attribute the crime to someone other than Stedman, Starr implied that the consistent statements included naming Stedman as the shooter. One cannot avoid a hearsay objection by disguising the declarant or the statement. Indirect hearsay is excludable because the testimony necessarily implicates the credibility of someone other than the testifying witness,[1] and Ciobotaru's credibility was unquestionably at issue when Starr testified that what he learned from him was consistent with what Stedman had told him. The testimony concerning Ciobotaru's consistent statements is no less hearsay than a police officer testifying to "what he learned" from conversations,[2] or to an officer testifying that he made an arrest as a result of a conversation with a witness.[3]
We must next consider whether these "consistent" statements were introduced for the truth of the matters asserted therein, or for some other purpose. Neither the State nor the majority suggest a non-hearsay purpose for the statements, and none is apparent. Starr testified that Ciobotaru told him that Stedman had made admissions — in this scenario Ciobotaru, and not Stedman, is the declarant at issue. The matter asserted is not that Stedman made the admission, but that he made the admission to Ciobotaru, the declarant, and the mere fact that Ciobotaru said that Stedman made the admission means nothing. The testimony is irrelevant unless Ciobotaru's statement is accepted for its truth, and the prosecutor implicitly recognized this in closing argument when he invited the jury to believe Starr's testimony regardless of whether his knowledge came from Stedman or Ciobotaru. The prosecutor stated:
 But Andrew Starr could get that information from only two places, the defendant or George. Where did George get that information? He wasn't there that night. We're not accusing him of that. He got the information from the defendant. So all of Starr's information came from either George C or the defendant. He did not talk to James Potasiewicz about this crime.
Because Starr's testimony concerning Ciobotaru's statements was impermissible hearsay, I would sustain the first assignment of error.
The second assignment states:
 II. THE TRIAL COURT ERRED AND PREJUDICED THE APPELLANT WHEN IT IMPROPERLY INSTRUCTED AND REPRIMANDED A WITNESS.
The State offered the testimony of George Ciobotaru, expecting him to testify that Stedman admitted the murder to him, consistent with an oral statement he made to Torsney and Garisek in November 1996. At trial, however, Ciobotaru sought to recant his statement, and the following proceedings ensued on direct examination by the State:
 Q. Do you recall what you told them concerning Matt Stedman?
A. Initially that I didn't know anything.
Q. And then what did you tell them?
A. Eventually they coerced a statement out of me.
THE COURT: Let me see the attorneys at sidebar.
* * *
Q. Well, tell me what you told the police at that time.
 A. Initially, I told them that I didn't know anything, and that didn't stand too well with them. Then they —
Q. No. The question is, what did you tell them?
A. What did I tell them?
Q. Yes.
A. I made a statement.
Q. Okay. What did you tell them?
 A. I basically told them what they wanted to hear to get them off my back.
 THE COURT: All right. Just a minute, just a minute. We're going to take a break here.
MR. HORN: Thank you, your Honor.
The judge then excused the jury and conducted the following proceedings outside its presence:
 All right. Please be seated, ladies and gentlemen. I would like to place upon the record a discussion that was had at sidebar.
 Prosecutor Michael Horn, prior to calling this witness, approached the sidebar and indicated that, in fact, he may have a situation where Mr. Ciobotaru refuses to testify or changes his previously given statement to the police officers.
 Mr. Horn asked if it would be appropriate for the Court to call him as a Court's witness, and we discussed this at sidebar with all counsel present. I made a determination at that time that I would ask the State of Ohio to call this witness and then I will permit the State of Ohio to request in front of the jury that they be permitted to cross-examine him as a hostile witness if he backed off of his statement. It's obvious to me that Mr. Ciobotaru is headed in that direction.
 But, Mr. Ciobotaru, I have cleared this courtroom from the jury to issue a very clear warning to you, sir. You must testify in this case. You have been subpoenaed, you have been sworn, and you have testified. You have waived any privilege at this point not to testify. You are not a subject of this proceeding, you do not face jeopardy, and therefore you may not evoke [sic] your Fifth Amendment rights.
 I want to further advise you that your testimony is being transcribed by the court reporter. If I conclude that you have made a statement that is inconsistent with your former statement — I should say if you make a statement that is inconsistent with your former statement, I'm going to order a copy of this transcript immediately transcribed, provided to myself, the prosecution and the defense, and I'm going to have my staff attorney personally walk it to the assistant county prosecutor — I should say county prosecutor, William Mason.
 Now, if you think that this is an idle threat, I want you to be aware of the fact that the first person convicted of perjury in Cuyahoga County was convicted as a result of perjury that occurred in my courtroom and that person was sentenced to prison and served a term of incarceration.
 I'm going to give you a few moments to reflect on what I just said. You will remain in the courtroom under the supervision of the deputy that's present. Do you understand me?
THE WITNESS: Yes, sir.
THE COURT: Do you have any questions?
THE WITNESS: No, sir.
THE COURT: All right.
 Actually, the deputy will have to remove Mr. Stedman at this time. I would like the detective to maintain custody of this defendant [sic] until his testimony is concluded.
(Thereupon, a break was had.)
 (Thereupon, the following further proceedings were had in open Court in the presence of the jury:)
 THE COURT: Thank you, ladies and gentlemen. Mr. Horn, you may continue your direct examination.
Ciobotaru continued to testify, and while he admitted to making a statement to Agent Torsney and Detective Garisek in November of 1996, he continued to maintain that the statement was false, and stated that he did not remember Stedman ever admitting the murder. The prosecutor then requested, in the jury's presence, that Ciobotaru be declared a hostile witness, and the judge did so, as follows:
 MR. HORN: Judge, at this time, I would like the witness to be declared a hostile witness.
 THE COURT: Yes. For the purposes of the record, the witness is declared a hostile witness at this time, and I will now permit the State of Ohio to question him through cross-examination, if necessary.
 By the way, one point of clarification. What was the date of this witness's statement to the police?
MR. HORN: November 22, 1996.
THE COURT: And this was an oral statement?
MR. HORN: Yes.
THE COURT: Thank you.
During examination by both the prosecution and the defense, Ciobotaru testified that as many as thirty people were aware of the murder story, but he could not remember which of those people had related details of the crime to him. He testified that he had discussed the murder story with Potasiewicz, who was his roommate at the time, as well as with Starr and, indeed, that he had discussed the murder with Starr as recently as the day before his testimony. He said that most of the people that he, Stedman, and Potasiewicz worked with at the time were aware of the story, and that it was Potasiewicz, and not Stedman, who made jokes about the murder.
After the lawyers completed their examination, the judge again addressed Ciobotaru, in the presence of the jury, as follows:
THE COURT: So, Mr. Ciobotaru —
THE DEFENDANT [sic]: Yes, sir.
 THE COURT: — you're saying that you weren't telling the truth to the police officers when you made the statement to them? Is that what you are saying?
 THE WITNESS: Back when they questioned me at my home?
THE COURT: Yes.
 THE WITNESS: I'm telling you that — I'm telling you that my records were false, that I told them something that was false. Yes, I am saying that.
 THE COURT: You made a false statement to an F.B.I. agent?
THE WITNESS: And a Cleveland homicide officer.
 THE COURT: All right. Thanks. I'm glad we have that on the record.
You are excused. You may step down.
MR. HORN: May we approach?
THE COURT: Mr. Ciobotaru, come here.
THE WITNESS: Yes, sir.
 THE COURT: You forgot something. [apparently referring to an article taken from Ciobotaru when he took the witness stand]
THE WITNESS: Oh. Thank you. Am I released?
THE COURT: No. Sit in the back of the courtroom.
In closing argument, the prosecutor reminded the jury of the judge's actions with respect to Ciobotaru, as follows:
 Now, I said to you that JJ's testimony is unrebutted in this case, and it is with the exception of the problems with George Ciobotaru. So let's talk about him for a minute.
 I think everybody in this — everybody in this room will agree that that guy's testimony was absolutely incredible. Judge Gaul himself had to take the very unusual action of having him declared a hostile witness allowing Mr. Horn on behalf of the State of Ohio to cross-examine him. And he was unbelievable on that stand.
* * *
 Finally, with George, he's a liar. And that's what Judge Gaul established in the last questions Judge Gaul asked him, did you lie to the FBI and the police back in November of 1996? He said yeah. Now he's going to have to take the consequences for all of that.
If improper, a judge's comments threatening a witness with perjury charges can unfairly prejudice a trial in two ways: first, the comments can coerce the witness to alter his testimony, and second, the jury can be notified of the judge's feelings toward the witness and his testimony.[4]
I agree that Stedman cannot show that the judge's comments altered Ciobotaru's testimony; however, the majority wrongly state that all of the judge's comments, and his antipathy toward Ciobotaru, were expressed outside the jury's presence. The record shows the judge sua sponte
interrupting Ciobotaru's testimony, the prosecutor's expression of gratitude for the interruption, and the judge then excusing the jury. After declaring Ciobotaru a hostile witness in the jury's presence, the judge pointedly asked the prosecutor to give him details concerning Ciobotaru's statement before allowing him to continue the examination. Finally, before excusing Ciobotaru, the judge questioned him further concerning his statement, again in the presence of the jury, stated that he was "glad we have that on the record," and then ordered Ciobotaru to remain in the courtroom after his testimony was completed.[5] The prosecutor in closing argument then reinforced the impression made by the judge's conduct by reminding the jury of it, noting that the judge had specifically questioned Ciobotaru concerning the inconsistencies between his oral statement and his testimony, and that Ciobotaru would have to take the consequences for all of that.
The syllabus of this court's opinion in State v. Kay[6] states as follows:
 1. In a criminal trial before a jury, the court's participation by questioning or comment must be scrupulously limited lest the court, consciously or unconsciously, indicates to the jury an opinion on the evidence or on the credibility of a witness.
 2. Where questions asked and statements made by a trial judge in the progress of a criminal trial within the hearing of the jury may be construed as an opinion on the part of the judge concerning the credibility of a defendant or of a witness, or as his opinion as to the facts of the case, prejudicial error results.
The majority beats a full and unequivocal retreat from these principles. Ciobotaru openly stated throughout his testimony that his November 1996 statement to law enforcement officials was false. The judge's final questions were unnecessary for any purpose other than to show his personal disdain for Ciobotaru, and the judge's treatment of the witness throughout his testimony betrayed the hostility openly expressed toward him outside the jury's presence. Those comments "are of the same effect as though embodied in the charge to the jury,"[7] and the prosecutor's comments in closing argument exacerbated the unfair prejudice. One can only conclude that the judge's conduct showed an impermissible bias against Ciobotaru, and that "the atmosphere of the trial was such as to fall far short of the plain requirements of the law."[8] I would sustain the second assignment of error.
Stedman's third assignment of error states:
 III. THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO CALL A WITNESS IN VIOLATION OF THE RULES OF DISCOVERY.
Trial in this case began on Wednesday, September 29, 1999, and on Friday, October 1, 1999, the State attempted to supplement its discovery responses by adding Robert Nemeth as a witness. It attempted to notify Stedman's lawyer about this witness by fax which the lawyer claimed was not received, and he objected to the State's attempt to call Nemeth on Monday, October 4, 1999. The judge altered the witness schedule by having the State present Nemeth as its second witness on Monday morning, rather than its first. After the defense had a limited opportunity to interview Nemeth during a recess between testimony, the judge allowed him to testify on certain matters.[9]
Nemeth testified that on one occasion Stedman accompanied him and Ciobotaru when they harassed prostitutes in the area of East 40th and Cedar. Stedman argues that, in addition to the discovery violation, that testimony was inadmissible character evidence designed to show his propensity to commit the crime charged. The State counters that Nemeth's testimony was introduced for the limited purpose of showing Stedman's knowledge of the area, and the judge, in allowing the testimony, specifically stated that Nemeth would testify "as to the familiarity with the area * * *." Nemeth also testified about buying guns from Stedman, that police had tested those guns, and none matched the murder weapon.
The majority finds, pursuant to State v. Scudder,[10] that the State's discovery violation was not willful, that foreknowledge would not have benefited Stedman in preparing his defense and, although it fails to address Scudder's third factor, implicitly finds that Stedman was not unfairly prejudiced. Although I agree that Stedman did not show that Nemeth's name was willfully withheld, I cannot agree that he had an adequate opportunity to interview Nemeth prior to his testimony, or that his limited success in cross-examining Nemeth shows that he needed no more preparation than he was afforded. The majority's contention on this point is logically indefensible; Nemeth's demonstrated relationships with Potasiewicz and other witnesses shows that further preparation or investigation was clearly warranted. The majority appears to require Stedman to show what further investigation would have revealed, when such a showing is obviously impossible. Scudder's syllabus requires the determination to be made on the available record, which in this case shows that Nemeth's involvement with witnesses in the case required further investigation.
The majority states, without elaboration, that Stedman's lawyer had an opportunity to interview Nemeth before his testimony; in fact, the lawyer was allowed only a change in the order of witnesses to allow him time to prepare for Nemeth's testimony. This allowance gave only slight relief, as he had to be in court to examine the other witness, and had only a brief recess to prepare for Nemeth's testimony. The "opportunity" to interview Nemeth thus occurred only during a brief break between witnesses' testimony. The judge failed to allow the defense even the luxury of a lunch recess. This is not an adequate opportunity to investigate and discover a witness's testimony in a murder trial.
Prior knowledge of Nemeth's testimony would have given Stedman an opportunity to prepare impeachment or further investigate cross-examination issues for Nemeth or other witnesses, as well as providing a greater opportunity to develop a defense based on the negative weapons tests. Furthermore, knowledge of the testimony would have given the defense an opportunity to consider and develop objections to its admissibility.
The majority next accepts the judge's ruling that Nemeth's testimony was admissible to show Stedman's knowledge of the area and the activities of prostitutes, and also states that the testimony was admissible to prove his identity through showing a modus operandi or similar plan, although this justification was not advanced or considered at trial. While I agree that, ordinarily, this court is entitled to affirm a ruling on grounds other than those stated by the judge, such action is inappropriate here because Stedman's lawyer was given an inadequate opportunity to research and prepare objections to the evidence.
App.R. 12(B) allows affirmance if we determine that the trial judge "committed no error prejudicial to the appellant * * * and that the appellee is entitled to have the judgment or final order of the trial court affirmed as a matter of law * * *." Hence, while affirmance on other grounds is appropriate if those grounds mandate the same result, it is inappropriate to affirm on grounds that do not rise to the status of "matter of law." We should not affirm on grounds initially directed to the trial judge's discretion if the judge did not exercise that discretion.[11] It is one thing to affirm a judge's exercise of discretion when the parties have had an opportunity to fully inform him on the salient issues, but it is quite another to affirm a ruling made in haste, and without opportunity for the parties to point out legal and factual issues and their consequences within the context of the entire trial. Had this been done, it cannot be said with any degree of certainty, much less that degree necessary to find error harmless beyond a reasonable doubt,[12] that the trial judge would have allowed this untimely submission of evidence for its extremely dubious value in showing a plan or modus operandi.
Before addressing the majority's alternative theory for admitting the testimony, I first address the rationale proposed by the State, and accepted by the judge at trial. Nemeth's testimony was admitted for the purpose of showing Stedman's familiarity with the area where the murder was committed. His testimony, however, referred to the area of East 40th Street and Cedar Avenue, over forty blocks and approximately 1.5 miles from where the shooting occurred. Moreover, Stedman's familiarity with the area was a relatively unimportant detail, while the evidence's natural use was to show his propensity to engage in similar acts, in violation of Evid.R. 404(B). The jury was not instructed to use this evidence for the limited purpose admitted, or to refrain from making the natural, albeit highly prejudicial and improper inference. When the prosecutor recounted Nemeth's testimony in closing argument, Stedman's familiarity with the area was mentioned only as an afterthought. The prosecutor stated:
 Now, finally, you heard just briefly this morning from a gentleman by the name of Robert Nemeth. He was a friend of all these people way back when. He told you that at least one occasion he went to the east side to razz or fool with the prostitutes in that area. I mean he also went on different occasions with George without the defendant. We don't know how many times, if at all, to be fair. The defendant and his 25-year friend George had gone and done the same thing. [Sic.][13] This seemed to be something this group did. But it establishes that the defendant was, number one, familiar with that area, even though he didn't live east, certainly familiar with the prostitutes and the situation of there being prostitution in that area. So he was at least familiar with that much of this crime.
The evidence was inadmissible under Evid.R. 404(B), and its probative value for the purpose offered was so minimal that it was, at best, substantially outweighed by the danger of unfair prejudice and inadmissible under Evid.R. 403(A).[14] Evidence is relevant only if it has probative value concerning any fact "of consequence to the determination of the action * * *."[15] Stedman's familiarity with the area was, if consequential at all, only minimally so, and the admission of Nemeth's testimony on this theory was error. Although, as notedsupra, I would find this error sufficient because the judge was not given an adequate opportunity to consider arguments for and against admitting the evidence on a plan or modus operandi theory, I also reject the majority opinion because the judge would have abused his discretion by admitting the evidence even if he had considered that theory.
Evidence of propensity to commit crime is excluded specifically because of its great prejudicial effect,[16] and Evid.R. 404(B) is strictly construed to limit the admissibility of "other acts" evidence.[17]
Where other acts evidence is intended to show identity through a modusoperandi or plan, the proponent of the evidence must show that the other act is related to and has common features with the crime in question,[18]
and the showing must again survive the construction against admissibility.[19] In warning against misuse of this exception, theLowe court stated:
 Identity is the least precise of the enumerated purposes of Evid.R. 404(B) * * * and we therefore must be careful when considering evidence as proof of identity to recognize the distinction between evidence which shows that a defendant is the type of person who might commit a particular crime and evidence which shows that a defendant is the person who committed a particular crime.[20]
In light of the construction against admissibility and the special danger of misusing other acts by pointing to overly generalized "common features," the showing of identity through modus operandi should include some unique, idiosyncratic or distinct common characteristics that link the two acts.[21] Moreover, the acts should not be too remote in time or place.[22] Without limitation, the modus operandi exception overwhelms Evid.R. 404(B) and allows evidence whose admissible purpose is far outweighed by its unfairly prejudicial effect.
The acts here fail to share one critical, glaring detail — the existence of a murder. Although proof of identity through modus operandi
does not require that acts be the same,[23] they must share some features peculiar enough to allow an inference of identity in the commission of the charged crime. Stedman's participation, on one occasion, in an activity that Nemeth testified to have engaged in frequently, harassing prostitutes by driving away after they approached the car, provides no peculiar details linking Stedman to Potasiewicz's story of the murder. Knowledge that prostitutes approach cars to solicit business is not peculiar,[24] and there is no evidence to justify the inference that Stedman would escalate the conduct from driving away to murder. This is analogous to proving an armed bank robbery by showing the suspect previously walked into a bank and stole deposit slips. The evidence of time and place is not distinctive — in fact, Nemeth's testimony that he and Ciobotaru engaged in this activity in 1993 and/or 1994 raises the distinct possibility that Stedman accompanied them after February 5, 1994, the date of Scott's murder. Moreover, as noted supra, the modus operandi, if one existed, was Nemeth's — Stedman accompanied him in the conduct only once, and did not initiate it.
Because the State's untimely identification of Nemeth prejudiced Stedman's ability to investigate and prepare defenses and objections, and because Nemeth's testimony violated Evid.R. 404(B) and 403(A), I would sustain the third assignment of error.
Stedman's fourth assignment of error, submitted pro se, states the following:
 IV. FAILURE OF DEFENSE ATTORNEY, PRIOR TO TRIAL TO OBJECT OR ATTEMPT TO SUPPRESS, ANY TESTIMONY OR EVIDENCE CONCERNING THE DEFENDANT'S PLACE OF ARREST AND USE OF AN ALIAS.
The State introduced evidence of an unrelated arson charge as relevant to Stedman's flight. It argued that Stedman fled the country to avoid the arson charge because he feared any contact with law enforcement officials would uncover his commission of murder. In closing argument the prosecutor stated the following:
 What makes sense, we know that there was a warrant out for the defendant at that time for aggravated arson. George C. pled to an arson about that time. Defendant didn't show up for court for that arson. We submit that the defendant knew he killed this girl, the defendant knew the police were knocking on his door, the defendant didn't want to go to jail, the defendant left the country.
In appropriate circumstances, evidence of a suspect's flight from justice is allowable, because flight is viewed as showing knowledge of guilt, and thus as an admission of guilt.[25] To be admitted under this theory, however, the conduct at issue must pass threshold tests allowing a competent inference that it is indeed an admission of guilt. The test has been described as requiring the following four inferences: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.[26]
The inferences must be supported by sufficient evidentiary manifestations suggesting defendant's decision to flee was prompted by considerations related to the crime in question.[27]
Could Stedman's flight be used to infer his guilt of the crime charged? The evidence showed he fled in June 1995, while under indictment for aggravated arson, and with ATF agents seeking him for unspecified weapons charges apparently related to those faced by Starr, i.e., the manufacture of automatic weapons. The State argued that Stedman went to great lengths to escape detection, and that these efforts were consistent with his flight from the more serious charge of murder, and thus the inference was allowable. Starr testified that he was threatened with a ten-year sentence for the automatic weapons charges against him. Stedman presumably faced similar weapons charges, and his arson charge was, under applicable law, an aggravated felony of the first degree carrying a sentence of five to twenty-five years. Stedman, therefore, faced substantial allegations apart from the aggravated murder charge, and it is by no means clear that his flight was related to his consciousness of guilt of the murder. Moreover, while evidence of flight is regularly admitted to show consciousness of guilt, courts also regularly caution against its limited probative value.[28]
I agree that evidence that a defendant committed other crimes should not always prevent evidence of flight, and that a judge should have discretion to decide when evidence fairly points to flight from the crime charged and has probative value significant enough to overcome competing inferences or unfair prejudice. Again, however, I must dissent because the judge failed to exercise any discretion to admit or exclude the evidence on that basis, but instead erroneously overruled Stedman's objection as untimely.
Stedman objected to the evidence on the second day of trial, before the testimony of Agent Torsney, the primary witness concerning his flight and capture. The judge refused to consider the objection on the basis that it was untimely because there had been no objection to the State's discussion of flight in its opening statement, and his lawyer had responded to that discussion in his own opening. The judge's ruling essentially required Stedman to submit a motion in limine, prohibiting reference to the evidence until its admissibility was determined at trial.[29] Nothing requires a party to submit a motion in limine or waive objection at trial; such a motion is insufficient to preserve error,[30] and is also unnecessary to preserve error. Regardless of whether a motion in limine is filed, error is preserved by timely objection.[31]
Stedman timely objected, the judge erred in finding otherwise, and should have made an admissibility determination. Instead, it appears the judge was concerned that the State would be prejudiced if the evidence were excluded after the prosecutor mentioned it so prominently in opening statement, and sought to protect the State from its mistaken reliance on inadmissible evidence. This ruling indicates that the judge had at least a substantial concern that the evidence was inadmissible, and might have so ruled if he had properly exercised his discretion. I would sustain the fourth assignment of error.
I would find assignments five, six, and seven moot, but write to further address the evidence of the arson charge against Stedman. While I agree that the introduction of the arson charge does not qualify as plain error or ineffective assistance of counsel (at least on this record), I disagree with the majority's statement that the arson charge was admissible under Evid.R. 404(B) to show "Stedman's knowledge that he was wanted by the police, which he feared might lead to detection of his involvement in Scott's murder". In essence, the theory is that the arson charge was admissible to show knowledge of the murder. I cannot overlook such an inferential leap.
The State's proffered purpose for the arson evidence cannot be sustained. Even if the judge found the evidence of Stedman's flight from justice admissible, this would not justify the further presentation of the arson evidence absent the defense's acquiescence. As with the evidence of harassing prostitutes, the arson charge was inadmissible under Evid.R. 404(B), and the State's alternative purpose would have to be substantial in order to make it admissible in spite of Evid.R. 403(A). The State's justification, that the arson charge demonstrated knowledge of the murder, could not possibly meet that standard, and the evidence should have been excluded on the defense's objection.
The defense, however, did not object to introduction of the arson charge, possibly because it provided an independent explanation for Stedman's flight from justice. Although Stedman's lawyer did not expressly argue this theory, he might have hoped the jury would arrive at that conclusion without having to dwell on the arson charge himself. Therefore, although I would not sustain the seventh assignment of error, I would find it moot because the case should be reversed and remanded on other grounds.
I would find the fifth assignment of error moot based on my resolution of the fourth assignment of error. Even though the ineffective assistance of counsel claim could be overruled on the ground that allowing the arson evidence was a reasonable tactical choice to address the evidence of flight, these tactics might be rendered unnecessary if the judge, in the exercise of his discretion, found the flight evidence inadmissible.
Similarly, I would find the sixth assignment of error moot because new trial tactics would be required on remand. I note, however, that the majority decision overruling this assignment is based upon review of the existing trial record, and does not necessarily prevent post-conviction claims.
Stedman's eighth assignment of error states:
 VIII. PROSECUTION'S CLOSING ARGUMENT STATEMENT OF ADDITIONAL EVIDENCE THAT COULD BE EXPLAINED AFTER THE TRIAL.
Under this assignment, Stedman claims he was prejudiced by the prosecutor's statement that "we could explain to you later why every single person that may have heard about this was not called as a witness." Stedman's lawyer did not object to the remark, and it is reversible only on a finding of plain error.[32] The majority finds that Stedman waived error, and that the prosecutor's remarks were proper in any event. According to the majority, the State "properly alluded" to non-testifying witnesses in closing argument — this is tantamount to saying that, in closing argument, it is proper to refer to facts not in evidence. The prosecutor's remark was intended to lead the jury to believe that the State had further evidence against Stedman, but chose not to present it. An offer to explain something later is intended to convey the message that further information is available. The majority makes the incredible claim that the prosecutor was asking the jury to consider the evidence presented as sufficient, when the plain import of the words used means just the opposite. In its effort to aid the prosecutor, the majority has redefined American English. "I can explain later," now means "I have told you everything."
Furthermore, as discussed supra, the prosecutor encouraged the jury to speculate that Ciobotaru and Stedman had harassed prostitutes on several occasions,[33] even though Nemeth testified that Stedman was present only once, and encouraged the jury to use the evidence for its improper purpose. Finally, as noted, it was inappropriate for the prosecutor to point out the judge's demeanor toward Ciobotaru in an effort to show that the judge doubted the credibility of his testimony.
Although these errors might not have satisfied the plain error or ineffective assistance of counsel standards if viewed in isolation, the references to facts not in evidence are substantial and prejudicial, and must also be viewed in light of the multiple errors already discussed in assignments of error one, two, three, and four[34]. Suggesting that non-testifying witnesses might corroborate the testimony of those that appeared and pointing out the judge's attitude toward Ciobotaru were no small matters, especially considering the credibility problems of all the testifying witnesses.
I would sustain assignments of error one, two, three, four, and eight, find assignments five, six, and seven moot, reverse the conviction and remand for a new trial.
[1] Mitchell v. Hoke (E.D.N.Y. 1990), 745 F. Supp. 874, 876, affirmed (C.A.2, 1991), 930 F.2d 1.
[2] State v. Mason (Nov. 9, 1983), Summit App. No. 11182, unreported.
[3] State v. Cassidy (Mar. 6, 1990), Franklin App. No. 88AP-1054, unreported.
[4] See Annotation, "Admonitions Against Perjury or Threats to Prosecute Potential Defense Witness, Inducing Refusal to Testify, as Prejudicial Error," 88 ALR 4th 388 (1991); State v. Lawrence (1954),162 Ohio St. 412, 55 O.O. 236, 123 N.E.2d 271.
[5] After excusing the jury, the judge further berated Ciobotaru and informed him that he would carry out his threat to supply a transcript of the proceedings to the county prosecutor.
[6] (1967), 12 Ohio App.2d 38, 41 O.O.2d 91, 230 N.E.2d 652.
[7] Id., at 49, 230 N.E.2d at 660.
[8] Lawrence, 162 Ohio St. at 415, 123 N.E.2d at 272.
[9] It is not clear whether the judge prohibited Nemeth from testifying on other proffered matters because of the discovery violation or because he found the testimony otherwise inadmissible.
[10] (1994), 71 Ohio St.3d 263, 269, 643 N.E.2d 524, 529-30.
[11] See State v. Peagler (1996), 76 Ohio St.3d 496, 668 N.E.2d 489, paragraph one of the syllabus (decision on other grounds requires evidentiary basis).
[12] See State v. Griffin (2001), 142 Ohio App.3d 65, 79, 753 N.E.2d 967
975 (Numerous evidentiary errors rose to constitutional proportions); even if a less restrictive standard applied, the numerous errors defeat a claim that substantial evidence supports the conviction.
[13] Despite the punctuation, the prosecutor's remarks can only amount to speculation that Stedman engaged in this activity more than the one time Nemeth testified to. We will discuss the import of these remarks infra, when addressing the eighth assignment of error.
[14] The less flattering alternative is that the admissible purpose was entirely pretextual, and the evidence was intended at all times for its inadmissible purpose.
[15] Evid.R. 401.
[16] State v. Sutherland (1994), 92 Ohio App.3d 840, 847, 637 N.E.2d 366,370.
[17] State v. Broom (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.
[18] State v. Lowe (1994), 69 Ohio St.3d 527, 634 N.E.2d 616, paragraph one of the syllabus.
[19] Id., at 530, 634 N.E.2d at 619.
[20] Id.
[21] State v. Williams (1988), 55 Ohio App.3d 212, 214-15,563 N.E.2d 346, 349.
[22] Id.
[23] See Lowe, 69 Ohio St.3d at 531, 634 N.E.2d at 619.
[24] See Lowe, 69 Ohio St.3d at 532, 634 N.E.2d at 620 (use of rope is not sufficiently distinctive); Williams, supra (robberies not distinctly linked where [e]ach involved an apparent prostitute who robbed a victim at a traffic light in a large city with many prostitutes who reputedly commit robberies.); State v. Covrett (1993), 87 Ohio App.3d 534, 541-42,622 N.E.2d 712 (robberies of homosexuals in their homes too general to establish modus operandi).
[25] State v. Williams (1997), 79 Ohio St.3d 1, 11, 679 N.E.2d 646,657.
[26] United States v. Peltier (C.A.8, 1978), 585 F.2d 314, 323 (quotingUnited States v. Myers (C.A.5, 1977), 550 F.2d 1036, 1049); see, also,State v. Wagner (Jan. 17, 1985), Cuyahoga App. No. 48433, unreported.
[27] Peltier.
[28] Peltier, supra (citing, inter alia, Wong Sun v. United States
(1963), 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 9 L.Ed.2d 441); State v.Kelly (Sept. 15, 1989), Geauga App. No. 1465, unreported.
[29] See, e.g., State v. Grubb (1986), 28 Ohio St.3d 199, 28 OBR 285,503 N.E.2d 142, paragraph one of the syllabus (motion in limine allows judge to temporarily prevent reference to evidence).
[30] State v. Maurer (1984), 15 Ohio St.3d 239, 258-60, 15 OBR 379, 473 N.E.2d 768, 787-88.
[31] Id.; Evid.R. 103(A)(1).
[32] State v. Underwood (1983), 3 Ohio St.3d 12, 3 OBR 360,444 N.E.2d 1332, syllabus.
[33] An invitation also accepted by the majority opinion.
[34] State v. Hill (2001), 92 Ohio St.3d 191, 749 N.E.2d 274, syllabus.